198 P.3d 604

Colleen HANABUSA, Individually and in her capacity as Senate President and Norman Sakamoto, Individually and in his capacity as Chair of the Senate Committee on Education, Petitioners,

v.

Linda LINGLE, Governor, State of Hawai'i, Respondent.

No. 29391.

Supreme Court of Hawai'i.

Dec. 15, 2008.

Richard Y. Wada, Honolulu, Jodi L. Eaton, and Jon Van Dyke, Honolulu, for petitioners.

Mark J. Bennett, Attorney General, Charleen M. Aina and Russell A. Suzuki, Deputy Attys. Gen., for respondent.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

PER CURIAM.

In this original proceeding, petitioners Colleen Hanabusa, individually and in her capacity as Senate President, and Norman Sakamoto, individually and in his capacity as Chair of the Senate Committee on Education (petitioners), petitioned this court for a writ of mandamus directing Linda Lingle, Governor of the State of Hawai'i (respondent), to forthwith nominate six candidates to the University of Hawaii Board of Regents from the list of qualified candidates duly presented to respondent on February 21, 2008 by the Can-

didate Advisory Council pursuant to Hawai'i Revised Statutes (HRS) § 304A–104.5(b) (Supp.2007).

On December 4, 2008, we issued an order granting the petition and directed respondent to nominate, within thirty days, six regent candidates from the list of qualified candidates duly presented to respondent on February 21, 2008 by the Candidate Advisory Council.

## I. *Background*

The 2005 legislature adopted S.B. 1256, H.D. 1, which proposed to amend the Hawai'i Constitution, article X, section 6, to modify the appointment process for the University of Hawaii Board of Regents (BOR) by requiring the governor to select BOR candidates from pools of qualified candidates presented to the governor by a candidate advisory council. In adopting S.B. 1256, H.D. 1,

> [i]t [was] the intention of the legislature that the existing members of the board of regents of the University of Hawaii serve their full terms of office. As each term expire[d], the regent w[ould] be replaced by an appointed member screened and proposed by the candidate advisory council.

S.B. 1256, H.D. 1, 23rd Leg., Reg. Sess. (2005).

The proposed amendment to article X, section 6 was ratified by Hawai'i voters on November 7, 2006. Article X, section 6, as amended, provides in relevant part:

> There shall be a board of regents of the University of Hawaii, the members of which shall be nominated and, by and with the advice and consent of the senate, appointed by the governor from pools of qualified candidates presented to the governor by the candidate advisory counsel for the board of regents of the University of Hawaii, as provided by law. . . .

Hawai'i Constitution, article X, section 6.

The amendment to article X, section 6 was implemented by the 2007 legislature by Act 56. Section 1 of Act 56 stated the Act's primary purpose of establishing the BOR candidate advisory council and added that:

> . . . [T]he legislature renews its previously stated intent, as provided in Senate Bill No. 1256 (2005), that "the existing members of the board of regents of the University of Hawaii serve their full terms of office. As each term expires, the regent will be replaced by an appointed member screened and proposed by the candidate advisory council[.]"

2007 Haw. Sess. Laws Act 56 (Act 56), § 1, at 92.

Section 2 of Act 56 amended HRS chapter 304A (Supp.2006) (University of Hawaii System) by adding a new section establishing the BOR candidate advisory council. Section 3 of Act 56 amended HRS § 26–11 (1993) (Executive and Administrative Departments, University of Hawaii) by increasing the membership of the BOR from twelve to fifteen members and with a specified number of members representing different geographic areas. Section 4 of Act 56 amended HRS § 304A–104 (Supp.2006) (Regents; appointment; tenure; qualifications; meetings) by amending subsection (a), in relevant part, as follows:

> (a) . . . The term of each member shall be [for four years;] five years[.] . . . Every member may serve beyond the expiration date of the member's term of appointment until the member's successor has been appointed [and has qualified.] by the governor and confirmed by the senate in accordance with article X, section 6 of the state constitution. Members shall serve no more than two consecutive five-year terms; provided that the members who are initially appointed to terms of two years or less pursuant to section 26–11(a) may be reappointed to two ensuing five-year terms. If a member is to be appointed to a second term of five years, the senate shall consider the question of whether to reconfirm the member at least one hundred twenty days prior to the conclusion of a member's first five-year term; provided that if the senate is not in session within one hundred twenty days prior to the conclusion of the member's first five-year term, the member shall continue to serve until the senate convenes for the next regular session or the next special session for which the sen-

ate is authorized to consider the question of reconfirmation.

2007 Haw. Sess. Laws Act 56, § 4 at 95. Section 5 of Act 56 provided that:

Notwithstanding the requirements of section 304A–104, [HRS], as it read prior the effective date of this Act, the terms of those members of the board of regents of the University of Hawaii that are to expire on or before June 30, 2007, shall be extended until the earlier of June 30, 2008, or until such time as new members of the board of regents have been appointed pursuant to the appointment process established pursuant to this Act, at which time their terms shall expire; provided that the current members shall serve their full terms.

2007 Haw. Sess. Laws Act 56, § 5 at 96. Act 56 was effected on May 1, 2007, over respondent's veto.

On July 1, 2007, the Candidate Advisory Council (CAC) was appointed. At that time, there were ten BOR members. Three members's terms expired in 2009 and 2011, five members's terms expired on June 30, 2007, and two members's terms expired on June 30, 2008. The CAC was thus tasked with qualifying and screening candidates for twelve of the fifteen BOR seats.

On February 21, 2008, the CAC presented respondent with a list of twenty-two candidates to fill the twelve BOR seats. The list was copied to petitioners in their capacities as Senate President and Senate Education Committee Chair.

On March 31, 2008, respondent nominated, from the CAC's candidate list: (1) Catherine Lagareta and Teena Rasmussen for the two at large seats, (2) Harvey Tajiri and Carl Carlson, Jr. for the two Hawaii County seats, and (3) Artemio Baxa for the one Maui County seat. The nominations were submitted to petitioner Hanabusa and members of the Senate on April 1, 2008.

On April 1, 2008, petitioner Sakamoto wrote respondent, acknowledging receipt of the five nominations for the twelve BOR seats and requesting the date that seven more nominations would be submitted "so that [the Senate] may act upon [the twelve nominations] before the close of the session." Petitioner Sakamoto explained that the Senate had anticipated receiving, by then, all twelve nominations and he asked respondent to "please provide reasons for the delay of the seven nominees so that we might understand the circumstances which prompted the delay." Petitioner Sakamoto made the same inquiry and request to respondent on April 7, 2008 when respondent did not respond.

On April 11, 2008, the Governor's Office responded to petitioner Sakamoto. It explained that it received that morning, from the CAC, an additional candidate for the Honolulu County seat to replace candidate James Donovan and it would "continue conducting due diligence on the candidates pending consideration" and that "upon completion, [it] [would] submit the information for [respondent's] consideration."

Petitioner Sakamoto forthwith responded by requesting respondent, on April 11, 2008, to "forward the remaining [BOR] nominees so that the nominees [can] have enough time to provide thoughtful and complete responses to the [Senate's] questionnaire and the Senate Education Committee [can] schedule the confirmation proceedings." Respondent, after further nomination requests from petitioner Sakamoto on April 15, 16, 18, and 21, 2008, submitted three more BOR nominations to the Senate on April 22, 2008: Dennis Hirota and Howard Karr for two of five Honolulu County seats and Joshua Wingstrom for the student seat.

On April 25, 2008, the Senate confirmed BOR nominees Rasmussen, Tajiri, and Carlson. On April 30, 2008, respondent withdrew Wingstrom's BOR nomination. On May 1, 2008, the Senate confirmed BOR nominees Baxa, Hirota, and Karr and rejected the confirmation of BOR nominee Lagareta. That day, the Regular Session of the 2008 Legislature adjourned.

On June 20, 2008, respondent notified BOR Chair Allan Landon that: (1) five BOR members whose terms expired on June 30, 2007— Byron Bender, Catherine Lagareta, Jane Tatibouet, Marlene Hapai, and Michael Dahi-

lig—agreed to hold over as BOR members[1] until their successors were nominated by respondent from the list of CAC candidates and the nominations confirmed by the senate; and (2) a sixth BOR member whose term expires on June 30, 2008—Ramon de la Pena—agreed to hold over as a BOR member[2] until his successor was nominated by respondent from the list of CAC candidates and the nomination confirmed by the senate.

Respondent's holdover agreements with the six BOR members came to the attention of Senator Les Ihara, who, on July 3, 2008, requested from the Governor's Office "a copy of the documents that appoint interim members of the UH board of regents made from May 2, 2008 through the present." The Governor's Office responded on July 8, 2008 as follows:

> There are no records that fit your request. The Governor has not made any interim appointments to the Board of Regents from May 2 through the present. Regents Byron Bender, Catherine Lagareta, Jane Tatibouet, Marlene Hapai, Ramon de la Pena and Michael Dahilig are presently serving as holdover members of the Board pursuant to Haw.Rev.Stat. § 304A–104, which provides that "[e]very member may serve beyond the expiration date of the member's term of appointment until the member's successor has been appointed by the governor and confirmed by the senate in accordance with article X, section 6 of the state constitution."

On July 29, 2008, petitioner Sakamoto advised BOR Chair Landon that regents Bender, Lagareta, Tatibouet, Hapai, Dahilig, and de la Pena were holding over "in possible violation of the law" because: (1) the Hawai'i Constitution, article V, section 6, prohibited the interim appointment of Lagareta after her nomination was rejected; and (2) Act 56, Section 5 did not permit an extension of a regent's term beyond June 30, 2008 for a regent whose term had expired on June 30, 2007 and for whom no successor had been appointed by June 30, 2008. Petitioner Sa-

kamoto invited respondent and the Attorney General to "clarify the matter."

On July 30, 2008, the Attorney General advised petitioner Sakamoto that none of the six regents at issue was an "interim appointment" and that each was lawfully serving as regent pursuant to specific language of Act 56.

> Act 56[ ] very clearly governs the instant situation with regard to the six Regents at issue here. The terms of office of the six were to expire either June 30, 2007 or June 30, 2008. None had a successor appointed and confirmed by the Senate during the 2008 regular session. Thus, pursuant to either their original appointments (if they were for a term to expire June 30, 2008) or Section 5 of Act 56, the terms of each of the six expired on June 30, 2008. Pursuant to the specific language of Section 4 of Act 56, each of these six Regents "may serve beyond the expiration date of the member's term of appointment until the member's successor has been appointed by the governor and confirmed by the senate in accordance with article X, section 6 of the state constitution." Each of the six Regents is thus a "holdover" who specifically serves pursuant to the terms of Act 56.

On July 30, 2008, petitioner Hanabusa advised the Attorney General and the BOR chair that

> certain members of the Hawaii State Senate contend that [respondent's] act of holding over [ ] regents [Bender, Lagareta, Tatibouet, Hapai, Dahilig, and de la Pena] is in direct contravention of the Constitution of the State of Hawaii and the provisions of Act 56 (S.B.14) of the 2007 Legislative Session. These holdover regents have either been specifically rejected by the Senate or have not availed themselves of the selection process required under the Constitution.

---

1. Bender, Lagareta, and Tatibouet agreed to hold over as members for three Honolulu County seats. Hapai agreed to hold over as member for the second at large seat. Dahilig agreed to hold over as the student member.

2. de la Pena agreed to hold over as member for the Kauai County seat.

Petitioner Hanabusa further advised the Attorney General and the BOR chair of "the intention of certain Senators to initiate legal proceedings to question the legitimacy of [the six] regents' current holdover status" and cautioned the BOR "to proceed with due care while [the six regents'] appointments are under review."

On October 6, 2008, petitioners initiated this original proceeding by filing a petition for a writ of mandamus. Petitioners sought a writ directing respondent to nominate, "in a timely manner," six BOR candidates from the CAC's list of qualified candidates to replace the six holdover regents. Petitioners contended that respondent is required to replace the six holdover regents because: (1) the Hawai'i Constitution, article X, section 6 mandates that regents "shall be nominated and ... appointed by the governor from pools of qualified candidates presented to the governor by the [CAC]"; (2) Act 56, Section 1 renewed the legislature's previously stated intent that regents serving as of May 1, 2007 shall serve their full terms of office and "as each term expires, the regent will be replaced by an appointed member screened and proposed by the [CAC]"; (3) Act 56, Section 5 provided that "the terms of those [regents] that are to expire on or before June 30, 2007, shall be extended until the earlier of June 30, 2008, or until such time as new [regents] have been appointed [from CAC candidate pools]"; (4) the legislature did not intend to implement a holdover provision when it enacted Act 56; and (5) interpreting Act 56 to allow holdover regents would "nullify the purpose of the CAC," "negate the purpose of the Constitutional Amendment [to article X, section 6]," and "deny the advice and consent powers afforded to the Senate by [article X, section 6]." Petitioners contended that respondent was duty bound by article X, section 6 and Act 56 to replace the six holdover regents by nominating six candidates from the CAC's list of qualified candidates and that respondent is arbitrarily refusing to perform this duty. They sought mandamus relief "[i]n order to mitigate any further delay or damage that may occur if the 'holdover' regents participate in decisions by the [BOR][.]"

Respondent answered the petition on November 6, 2008. She argued that petitioners lacked standing to invoke this court's remedial power of mandamus because they, as legislators, had only a special interest in the subject matter of their petition and they had not personally suffered a distinct and palpable injury. She argued that the petition for writ of mandamus should be denied because: (1) mandamus relief against her is warranted only for a duty that is ministerial and so plainly prescribed as to be free from doubt; (2) HRS § 304A–104(a) explicitly authorizes holdovers by regents and anticipates that the holdover period could be lengthy; and (3) neither article X, section 6 nor HRS § 304A–104(a) impose a mandatory deadline upon her to appoint replacement regents within the four-month period of time that had passed since the six holdover regents's terms expired on June 30, 2008.

Petitioners replied to respondent's answer on November 14, 2008. They argued that: (1) they personally suffered an injury sufficient to establish standing inasmuch as their constitutional obligation as senators to advise and consent on respondent's BOR appointments was usurped by respondent's holding over of the six regents; (2) mandamus is appropriate to compel respondent's power of appointment; and (3) Act 56 provided a specific time limit for respondent to act in the nominating process.

Oral argument was held on December 4, 2008. That day, we issued an order granting the petition for writ of mandamus and directed respondent to replace the six holdover regents by nominating, within thirty days, six regent candidates from the candidate list presented to respondent on February 21, 2008.

II. *Standard for Disposition*

■ A writ of mandamus is an extraordinary remedy that will not issue unless the petitioner demonstrates a clear and indisputable right to relief and a lack of alternative means to redress adequately the alleged wrong or obtain the requested action. *Kema v. Gaddis*, 91 Hawai'i 200, 204, 982 P.2d 334, 338 (1999) (citation omitted).

■ Mandamus relief is available to compel an official to perform a duty allegedly owed to an individual only if the individual's claim is clear and certain, the official's duty is ministerial and so plainly prescribed as to be free from doubt, and no other remedy is available. *In re Disciplinary Bd. Of Hawaii Supreme Court*, 91 Hawai'i 363, 368, 984 P.2d 688, 693 (1999). "A duty is ministerial where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion and judgment." *Salling v. Moon*, 76 Hawai'i 273, 274 n. 3, 874 P.2d 1098, 1099 n. 3 (1994) (citation omitted).

## III. *Discussion*

### A. *Petitioners Had Standing To Seek Mandamus Relief*

■ "Standing is concerned with whether the parties have the right to bring suit." *Mottl v. Miyahira*, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (quoting *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)).

It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's remedial powers on his or her behalf. *In re Application of Matson Navigation Co. v. Federal Deposit Ins. Corp.*, 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996). In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury. *Bush v. Watson*, 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996).

With respect to the first prong of this test, the plaintiff "must show a distinct and palpable injury to himself [or herself.]" *Life of the Land v. Land Use Commission of State of Hawai'i*, 63 Haw. 166, 173 n. 6, 623 P.2d 431, 446 n. 6 (1981). The injury must be "distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical." *Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1566 (10th Cir.1993) (citations omitted).

*Mottl*, 95 Hawai'i at 389, 23 P.3d at 724, quoting *Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court*, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999). The requirement of a "distinct and palpable injury" requires a plaintiff to have suffered an "injury in fact." *Mottl*, 95 Hawai'i at 391, 23 P.3d at 726.

*Mottl* involved a circuit court lawsuit for declaratory and injunctive relief from the finance director's and the governor's decision to reduce the University of Hawaii's allotment of funds by six million dollars for fiscal year 1998. The plaintiffs were: (1) three University of Hawaii faculty members and directors of the University of Hawaii Professional Assembly; (2) the University of Hawaii Professional Assembly; (3) Hawai'i State Senator Rod Tam; and (4) Hawai'i State Representative Chris Halford. The plaintiffs lost in circuit court on summary judgment and lost in this court for lack of standing in the circuit court. We held that none of the plaintiffs suffered an "injury in fact" as a consequence of the six million dollar reduction in funds. As to plaintiffs Tam and Halford, we concluded that:

> ... [T]he plaintiffs assert that Tam and Halford, who are members of the legislature, "have not only the interest of a general member of the public in seeing that the [fiscal and budget] laws of the state are complied with, but the interest of persons who have spent their own official time on behalf of their constituents, reviewing, voting on, and enacting budgets that become law." This establishes Tam's and Halford's "special interest" but not an "injury in fact." They have not alleged any "personal stake in the outcome of the controversy," inasmuch as they have not alleged that they had personally suffered any "distinct and palpable injury." *Akinaka*, 91 Hawai'i at 55, 979 P.2d at 1081. Because a "special interest" in the subject matter of a lawsuit is insufficient to invoke judicial intervention, Tam and Halford are without standing in this action.

*Mottl*, 95 Hawai'i at 392, 23 P.3d at 727.

■ Petitioners sought mandamus relief in their individual capacities and in their capaci-

ties as state senators who passed Act 56 to modify the appointment process for regents and who confirm or reject respondent's regent nominees under the modified appointment process. Their standing to invoke our remedial power of mandamus was contested by respondent, who relied on *Mottl* and argued that petitioners's interest in preventing decision making by a BOR comprised of six holdover regents established their "special interest," but did not establish an "injury in fact." Respondent argued that petitioners made no allegation that they personally suffered any distinct and palpable injury as a consequence of the holdover by six regents.

Petitioners countered that they, as senators, "have a constitutional duty [under article X, section 6] to review and consent to, or reject [respondent's nominations of BOR candidates qualified by the CAC]" and that they were "deprived of performing their own constitutional obligations to advise and consent by [respondent's] acts in purposefully circumventing the constitutional nomination and appointment process [by holding over six regents]." They relied on authority from foreign jurisdictions holding that the "injury in fact" element of standing is met when a legislator is deprived of the right to advise and consent on executive appointments.

According to the legislators' allegations, the interest sought to be protected by this action [for declaratory and injunctive relief against the governor] is [the legislators'] unique statutory right to advise the Governor on executive appointments and to confer their approval or disapproval in this regard. Assuming these allegations to be true, we conclude that they allege a personal and legally cognizable interest peculiar to legislators. The interest asserted is simply not a "generalized interest of all citizens in constitutional governance. Since the right to advise and consent has been vested only in members of the legislature, and since only members of the legislature are bringing this action, the allegation that this right has been usurped by the Governor and [the Acting Commissioner of Commerce] are sufficiently personal to constitute an injury in fact, thus satisfying the minimum constitutional requirements of standing. We therefore believe

that it is reasonable to hold that the legislators have standing.

*Dennis v. Luis,* 741 F.2d 628, 631 (3rd Cir. 1984) (internal citations omitted) (suit by eight members of the Virgin Islands Fifteenth Legislature challenging the governor's appointment of one Arnold Golden as "acting" Commissioner of Commerce after Golden's nomination for such position was rejected by the legislature). *Accord Riegle v. Federal Open Market Committee,* 656 F.2d 873, 878 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981) ("We think it may argued plausibly that Senator Riegle has met the [burden of establishing injury-in-fact for purposes of standing].... [A]ssuming that the five Reserve Bank members of the [Federal Open Market Committee] are officers who must be appointed with the advice and consent of the Senate, Riegle's inability to exercise his right under the Appointments Clause of the [federal] Constitution [because Reserve Bank members are selected by a Board of Governors] is an injury sufficiently personal to constitute an injury-in-fact.").

The Hawai'i Constitution, article X, section 6, provides that BOR members "shall be nominated and, by and with the advice and consent of the senate, appointed by the governor from pools of qualified candidates presented to the governor by the [CAC]." Petitioners, as senators who must advise and consent on respondent's BOR nominees, alleged that their unique constitutional duty to do so was usurped by respondent's holding over of six regents. The decisions of the federal appellate courts in *Dennis* and *Riegle* are persuasive authority for finding that the allegation that petitioners's right to advise and consent on BOR appointments has been usurped by respondent and is sufficiently personal to constitute an injury in fact. Therefore, we hold that petitioners had standing to invoke our remedial power of mandamus.

B. *The Terms Of The Six "Holdover" Regents Expired On June 30, 2008 Pursuant To Act 56, Sections 1 And 5.*

As previously stated, Act 56 of the 2007 legislature implemented the 2006 amendment

to the Hawai'i Constitution, article X, section 6, that modified the appointment process for University of Hawaii regents by requiring the governor to select regent candidates from pools of qualified candidates presented to the governor by the CAC. In implementing the modified appointment process, the legislature, in Act 56, effective May 1, 2007, made specific provisions regarding the ten existing regents and their terms, which, as previously stated, expired on June 30, 2007 as to five regents, June 30, 2008 as to two regents, and 2009 and 2011 as to three regents. Section 1 of Act 56 provided that the ten existing regents will serve their full terms and "[a]s each term expires, the regent will be replaced by an appointed member screened and proposed by the [CAC]." Section 5 of Act 56 provided that the terms of the five regents whose terms expired on June 30, 2007 "shall be extended until the earlier of June 30, 2008, or until such time as new members of the board of regents have been appointed pursuant to the appointment process established pursuant to this Act, at which time their terms shall expire."

Regent de la Pena was appointed to a term expiring on June 30, 2008. Pursuant to Section 1 of Act 56, he served his full term and his term expired on June 30, 2008. Regents Bender, Dahilig, Hapai, Lagareta, and Tatibouet were appointed to terms expiring on June 30, 2007. Pursuant to Section 5 of Act 56, their terms were extended until June 30, 2008 or until they were replaced by regents appointed under the modified appointment process, which ever occurred earlier. They were not, by June 30, 2008, replaced by regents appointed under the modified appointment process and so their terms expired on June 30, 2008.

### C. The Continuation In Office By The Six Regents Whose Terms Expired Contravenes Act 56, Sections 1 And 5.

The terms of regents Bender, Dahilig, de la Pena, Hapai, Lagareta, and Tatibouet expired on June 30, 2008 pursuant to Act 56, Sections 1 and 5. Thus, pursuant to Act 56, Section 1, "[a]s each term expire[d], the regent will be replaced by an appointed member screened and proposed by the [CAC]."

The CAC's list of screened and proposed regent candidates, presented to respondent on February 21, 2008, included candidates to replace the six regents whose terms expired on June 30, 2008. Respondent acknowledged that the terms of six regents expired on June 30, 2008 pursuant to Act 56, Sections 1 and 5. Rather than nominating replacement regents from the CAC's candidate list in accordance with Section 1 of Act 56, respondent solicited and obtained holdover agreements with these six regents on June 20, 2008. The holdovers, according to respondent, were authorized by HRS § 304A–104(a) (Supp.2007).

■■■ HRS § 304A–104(a) provides that "[e]very [BOR] member may serve beyond the expiration date of the member's term of appointment until the member's successor has been appointed by the governor and confirmed by the senate in accordance with article X, section 6 of the state constitution." Respondent contended that this statutory provision (the holdover provision) explicitly authorized the holdovers of the six regents whose terms expired on June 30, 2008. We disagree.

■■■■ It is well settled that this court's foremost obligation in construing a statute
> is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Capua v. Weyerhaeuser Co.,* 117 Hawai'i 439, 447, 184 P.3d 191, 199 (2008) (citation omitted). Act 56, Section 5 provided that "[n]otwithstanding the requirements of [HRS] section 304A–104, as it read prior the effective date of this Act," the terms of the five regents whose terms expired on June 30, 2007 would expire on June 30, 2008. HRS § 304A–104—as it read prior to the May 1, 2007 effective date of Act 56—contained the holdover provision invoked by respondent for the continuation in office by the six regents. We construe Act 56, Section 5's "notwithstanding" clause to except the holdover provision of HRS § 304A–104(a) as to the five regents—Bender, Dahilig, Hapai, Lagareta,

and Tatibouet—to whom Section 5 of Act 56 applies. Such construction effectuates the legislature's intent-plainly stated in Section 1 of Act 56—that "[a]s each [existing regent's] term expires, the regent will be replaced by an appointed member screened and proposed by the [CAC]."

Respondent contended at oral argument that Section 5 of Act 56 "speaks only to [the regents's] terms," and, therefore, Section 5's "notwithstanding" clause does not refer to the holdover provision, but refers instead to the provision of HRS § 304A–104, as it read prior to May 1, 2007, that regents serve four-year terms. Section 5 speaks about regents's terms as to the *extension* and *expiration* of those terms. Though Section 5 can be construed as referencing the four-year term provision, it can equally be construed as referencing the holdover provision. Construing Section 5's "notwithstanding" clause—which applies to the "requirements" of HRS § 304A–104, as it read prior to May 1, 2007—as exclusively referencing the four-year term provision is not rational and sensible.

Excepting the holdover provision of HRS § 304A–104(a) as to regent de la Pena also effectuates the legislature's stated intent that de la Pena, an existing regent when Act 56 was effected, be replaced, when his term expired on June 30, 2008, by an appointed regent screened and proposed by the CAC. We hold that respondent's application of the holdover provision of HRS § 304A–104(a) to regent de la Pena and to regents Bender, Dahilig, Hapai, Lagareta, and Tatibouet contravenes Act 56, Sections 1 and 5. Application of the holdover provision to those six regents is contrary to the modified appointment process for regents prescribed by the Hawai'i Constitution, article X, section 6.[3]

D. *The Nomination And Appointment Of Regents Is A Nondiscretionary Duty Of Respondent That May Be Compelled By Mandamus When The Duty Is Not Performed After Passage Of An Unreasonable Period Of Time.*

The nomination and appointment of regents is a nondiscretionary duty imposed on

respondent by the Hawai'i Constitution, article X, section 6 (regents "shall be nominated and, by and with the advice and consent of the senate, appointed by the governor from pools of qualified candidates presented to the governor by the [CAC]"), HRS § 304A–104(a) (there shall be fifteen regents "who shall be appointed . . . by the governor"), and HRS § 304A–104.5(e) (for each regent seat to be filled, "the governor shall select one nominee from among the candidate advisory council's presentations").

Respondent did not dispute that the nomination and appointment of regents is a nondiscretionary duty. She contended, however, that the duty is not one that is so plainly prescribed as to be free from doubt because article X, section 6 and HRS §§ 304A–104(a) and 304A–104.5(e) prescribe how, but not when, regent nominations and appointments are to be made. She contended that article X, section 6 does not mandate the nomination and appointment of a regent as soon as a term expires or as soon as a seat is vacant and HRS § 304A–104(e) sets no time restriction on her selection of nominees from the CAC's candidate list. Respondent thus contended that there is no deadline mandated by law for the nomination and appointment of replacement regents for the six regents whose terms expired on June 30, 2008 and that a writ mandating the "timely" nomination and appointment of replacement regents was not warranted.

Petitioners countered that Act 56, Sections 1 and 5 imposed a deadline of June 30, 2008 for nominating and appointing replacement regents for the six regents whose terms expired on June 30, 2008. They further countered that a writ of mandamus was appropriate to compel the exercise of respondent's power to appoint regents, notwithstanding the lack of a time restriction in article X, section 6 or HRS § 304A–104(a).

■ We agree with jurisprudence from other jurisdictions that a governor's nondis-

---

3. The participation of Bender, Dahilig, de la Pena, Hapai, Lagareta, and Tatibouet, as regents, in business conducted by the BOR raises the issue of the validity of the BOR's decisions made since July 1, 2008. The issue is collateral to this mandamus proceeding and is an issue we decline to decide.

cretionary duty can be compelled by mandamus notwithstanding the absence of a stated time limit. *See Brotherton v. Moore,* 159 W.Va. 934, 230 S.E.2d 638, 642 (1976) (The governor's duty to appoint an executive officer upon occurrence of a vacancy in a non-elective office is a "nondiscretionary duty to act" and a "duty which can be enforced by mandamus."); *accord Trumka v. Moore,* 180 W.Va. 284, 376 S.E.2d 178 (1988); *see also Morganelli v. Casey,* 166 Pa.Cmwlth. 574, 646 A.2d 744, 747 (1994) (The governor's execution of death penalty warrants is a ministerial duty and "the absence of a stated time limit, within which the Governor must act, does not exempt the duty from being judicially mandated if not performed."). The governor's duty to act is enforceable by mandamus when the duty is "postponed unreasonably" and not performed after the passage of an "unreasonable period of time." *Brotherton,* 230 S.E.2d at 642; *Trumka,* 376 S.E.2d at 181; *Morganelli,* 646 A.2d at 747.

The *Brotherton* and *Trumka* courts observed that "we would be insensitive to the realities of public administration and abusive to the discretion of choice vested in a governor to hold that the act of appointment may be compelled at the instant of a vacancy." *Brotherton,* 230 S.E.2d at 642; *Trumka,* 376 S.E.2d at 181. The same view was expressed by this court in *Life of the Land v. Burns,* 59 Haw. 244, 580 P.2d 405 (1978), concerning the governor's duty under HRS § 26–34[4] to appoint successor members to boards and commissions upon the expiration of a member's term.

> ... *[T]he governor would be entitled to at least a reasonable time* after a term expires to nominate a qualified person to a board or commission. According to HRS § 26–34, it is necessary for the governor to submit the name of the person nominated to the senate for confirmation. Therefore, the subject of appointment of members to boards and commissions must necessarily be considered to be the joint responsibility

of the governor and senate, and the senate is privileged to inquire the governor's office about the appointment of any member whose term has expired *beyond such reasonable time.* We believe that the senate would be quick to expose the governor if he [or she] engages in tactics which would unduly delay the appointment of members of boards and commissions.

59 Haw. at 251, 580 P.2d at 410 (emphasis added).

We hold that the governor's duty—pursuant to the Hawaiʻi Constitution, article X, section 6, and HRS §§ 304A–104(a) and 304A–104.5(e)—to nominate and appoint members of the Board of Regents of the University of Hawaii is subject to a reasonable time standard. Reasonable time is judged by the totality of the circumstances. *Cf. Fukida v. Hon/Hawaii Service and Repair,* 97 Hawaiʻi 38, 45, 33 P.3d 204, 211 (2001) (reasonableness of the period of time claimed for loss of use of property is determined by evaluating the totality of the circumstances).

Respondent agreed at oral argument that her duty to nominate and appoint replacement regents for the six regents whose terms expired on June 30, 2008 was subject to a reasonable time standard. She contended, however, that as of December 4, 2008, a reasonable period of time had not passed for the nomination and appointment of the six replacement regents. We disagree.

Respondent was presented with the CAC's list of regent candidates on February 21, 2008. The list consisted of twenty-two candidates to fill twelve regent seats. All of the candidates had been qualified and screened by the CAC in accordance with criteria established by the CAC pursuant to HRS § 304A–104.5(a).[5] The CAC provided respondent with short biographies of each candidate. The CAC explained to respondent, in the candidate list, that the CAC, with the assistance of a nationally recognized firm,

---

4. HRS § 26–34(a) (1993) (Selection and terms of members of boards and commissions) ("The members of each board and commission established by law shall be nominated and, by and with the advice and consent of the senate, appointed by the governor.").

5. HRS § 304A–104.5(a) ("The candidate advisory council shall establish the criteria for qualifying, screening, and presenting to the governor candidates for membership on the board of regents.").

had background checks performed on each candidate and that based on the background checks, the CAC "concluded that there were no findings to indicate that any of the candidates would not be able to discharge the responsibilities as a member of the Board of Regents."

Respondent's selection of regent nominees was restricted to the twenty-two candidates presented to her on February 21, 2008. Respondent had two-and-a-half months from her receipt of the candidate list to the end of the 2008 regular legislative session to select from the list one nominee for each of the twelve seats to be filled. By the end of the regular session, respondent had selected seven nominees, six of whom were confirmed. Respondent thereafter had three opportunities to submit selections for the six remaining regent nominees when the first special legislative session convened in July 2008, when the second special legislative session convened in July 2008, and when the third special legislative session convened in November 2008.

Respondent's selection of the six remaining regent nominees is to be made from the same list of candidates that respondent has had since February 21, 2008 and is to be made from the twelve remaining candidates on the candidate list. The names of those twelve candidates have been with respondent since February 21, 2008.

Under the totality of the circumstances, the passage, to date, of nearly ten months since respondent was presented with the regent candidate list is an unreasonable period of time for respondent to perform her constitutional and statutory duty of nominating and appointing the six remaining regents. Consequently, respondent is subject to mandamus.