Electronically Filed
Supreme Court
SCWC-12-0000422
16-JAN-2015
09:33 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

ZAK K. SHIMOSE,
Petitioner/Plaintiff-Appellant,

vs.

HAWAIʻI HEALTH SYSTEMS CORPORATION dba HILO MEDICAL CENTER,
Respondent/Defendant-Appellee.

SCWC-12-0000422

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000422; CIV. NO. 09-1-383)

JANUARY 16, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND POLLACK, JJ.,
AND CIRCUIT JUDGE ALM, IN PLACE OF ACOBA, J., RECUSED

OPINION OF THE COURT BY NAKAYAMA, J.

Subject to some restrictions, Hawaiʻi Revised Statutes
(HRS) § 378-2.5 (Supp. 2007) allows employers to deny employment
based on an individual's conviction record "provided that the
conviction record bears a rational relationship to the duties and
responsibilities of the position." In 2007, Petitioner Zak K.
Shimose (Shimose) applied for employment as a radiological
technician (radtech) at Hawaiʻi Health Systems Corporation (HHSC)

dba Hilo Medical Center (HMC) (collectively HHSC/HMC). HHSC/HMC rejected Shimose's application based solely on his prior conviction for possession with intent to distribute crystal methamphetamine. The primary issue in this case is whether, as a matter of law, HHSC/HMC established the existence of a rational relationship between the radtech position and Shimose's prior drug conviction that would entitle it to summary judgment. We hold that it did not.

## I. BACKGROUND

Shimose was convicted of possession with intent to distribute crystal methamphetamine on August 28, 2001, and sentenced to 37 months in prison. While in prison, Shimose completed a bachelor's degree in philosophy at the University of Hawaiʻi, Hilo, and began investigating the radtech associates degree program at Kapiolani Community College (KCC). Shimose was released on March 7, 2003.

Shimose matriculated into KCC's radtech program in August of 2005. As part of the program, Shimose was assigned to HMC to complete a clinical rotation at HMC's imaging department. Shortly after the rotation began, HHSC/HMC initiated a suitability investigation into Shimose's background. HHSC/HMC concluded that Shimose's felony drug conviction disqualified him from participating in a clinical rotation at an HHSC facility, and removed him from the program. Shimose completed his clinical

requirements at another medical facility and graduated from the radtech program in the spring of 2007.

Shimose applied for a vacant radtech position at HMC on June 15, 2007, and submitted a second application on July 30, 2007. In August of 2007, HMC verbally indicated that Shimose would not be hired for the radtech position. Shimose submitted a request for administrative review with HHSC/HMC on November 1, 2007. On September 16, 2008, HHSC/HMC sent Shimose a letter indicating that he was disqualified from consideration for the radtech position because of his conviction for possession with intent to distribute a controlled substance.

Shimose filed a complaint with the Hawaiʻi Civil Rights Commission (Commission) on September 6, 2008, alleging a violation of HRS § 378-2 (Supp. 2007).[1] The Commission determined that "the medical center was lawfully entitled to consider [Shimose's] 2001 felony drug conviction in accordance with HRS § 378-2.5(1), and the conviction disqualified [him] from

---

[1]     HRS § 378-2 (Supp. 2007) provided then as it does now, in relevant part:

(a) It shall be an unlawful discriminatory practice:

(1) Because of . . . arrest and court record . . . :

(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment.

the position."[2]  The Commission issued a notice of dismissal and right to sue letter on August 6, 2009.  On October 25, 2009, Shimose filed suit in the circuit court alleging violations of HRS § 378-2 and article I, section 5 of the Hawaiʻi Constitution.[3]

The parties filed cross-motions for summary judgment in December of 2011.  In its cross-motion for summary judgment, HHSC/HMC asserted that the following facts were undisputed: (1) Radtechs treat vulnerable patient groups including children, geriatrics, and disabled patients; (2) many patients receiving treatment are in compromised physical and mental states and/or are receiving pain medication; (3) radtechs are often alone and unsupervised when imaging patients; (4) radtechs have access to patient charts that disclose what medications a patient is receiving; (5) radtechs have access to "an array of drugs that are not readily available to the public, as well as related supplies such as syringes and needles."[4]

---

[2]     HRS § 378-2.5 (Supp. 2007) provided then as it does now, in relevant part:

> (a) Subject to subsection (b), an employer may inquire about and consider an individual's criminal conviction record concerning hiring, termination, or the terms, conditions, or privileges of employment; provided that the conviction record bears a rational relationship to the duties and responsibilities of the position.

[3]     The Honorable Glenn S. Hara presided.

[4]     These facts were supported by the declaration of HMC's facility imaging director, Reynold Cabarloc.

4

With respect to pharmaceutical substances and supplies, HHSC/HMC alleged that radtechs have access to crash carts, drug reaction boxes, and anesthesia carts, and it attached exhibits that listed the contents of crash carts and drug reaction boxes.[5] HHSC/HMC also asserted that radtechs have access to virtually all areas of the hospital, and that many of those areas contain stored quantities of drugs and related supplies.

Based on these factual assertions, HHSC/HMC argued that it was entitled to summary judgment because a rational relationship existed between Shimose's conviction and the duties of a radtech. First, although HHSC/HMC did not specify what controlled substances a radtech might access, it argued that individuals with a felony drug conviction are unfit to handle controlled substances. Further, HHSC/HMC argued that individuals with a felony drug conviction are unfit to handle the non-controlled pharmaceuticals that were listed on the exhibits attached to the declaration of Reynold Cabarloc, as well as syringes and needles. Second, HHSC/HMC argued that individuals with a felony drug conviction are unfit to interact with patients who are currently taking medicine or are otherwise vulnerable. HHSC/HMC stated: "[T]here is an opportunity and risk that a

---

[5] The following substances were listed: (1) sterile water, (2) benadryl, (3) lidocaine, (4) zantac, (5) atropine, (6) aromatic ammonia inhalant, (7) albuterol inhaler, (8) amiodarone, (9) calcium chloride, (10) dextrose, (11) dopamine, (12) dopram, (13) epinephrine, (14) phenergan, (15) sodium bicarbonate, (16) solumedrol, (17) vasopressin, (18) zofran, and (19) 0.9% Bact NS.

vulnerable patient, who may be taking prescribed drugs and may be in significant pain, would have their medication taken from them and/or would be sold an illegal drug."

Shimose disputed several of the material facts that HHSC/HMC had alleged. First, Shimose disputed that radtechs have access to controlled substances and/or areas of the hospital where controlled substances are kept. Although Shimose admitted that radtechs have access to crash carts and drug reaction boxes, he asserted that neither crash carts nor drug reaction boxes contain controlled substances. Shimose attached the DEA's list of federally controlled substances to his motion and noted that none of the substances contained in crash carts or drug reaction boxes appeared on that list. See 21 U.S.C. § 812 (2012); 21 C.F.R. §§ 1308.11-1308.15 (2014).[6] Shimose asserted that anesthesia carts do not contain controlled substances and that they are locked and controlled by an anesthesiologist at all times. Shimose also asserted that all controlled substances at HMC are strictly secured in the hospital pharmacy and that radtechs do not have access to the pharmacy. Finally, Shimose contended that even "non-addictive drugs which are not restricted . . . are still strictly locked and supervised."

---

[6] See also Controlled Substance Schedules, U.S. Dep't Just., Drug Enforcement Admin., Off. Diversion Control, http://www.deadiversion.usdoj.gov/schedules/#list

Second, Shimose asserted that radtechs do not have greater access to vulnerable patient groups than visitors to the hospital, and that the level of contact with such groups is equal to that of any other profession. Specifically, Shimose asserted that radtechs are not often alone with vulnerable patients because those patients usually require the assistance of one or more additional hospital care workers. Shimose also asserted that contact with in-patients does not provide access to controlled substances because those substances are administered exclusively from authorized sources and are never left unattended in an in-patient's room. Finally, Shimose asserted that radtechs never administer controlled substances to patients, and that their duties are limited to imaging patients and assisting radiologists with special procedures.[7]

Based on these factual assertions, Shimose argued that the asserted relationship between the duties of a radtech and a felony drug conviction was irrationally based on biases and prejudices. Shimose argued that HHSC/HMC failed to establish that radtechs have access to controlled substances, and that there was no rational relationship between a felony drug conviction and access to non-controlled substances or supplies.

---

[7] Shimose attached HMC's job announcement for the radtech position and HHSC's six page radtech job description to his motion for summary judgment. These documents indicate that the daily responsibilities of a radtech include diagnostic imaging and related tasks, but do not include the administration of controlled substances.

Shimose also argued that the asserted connection between his conviction and the risk that vulnerable patients would have their medication taken from them and/or be sold an illegal drug was tenuous and unduly speculative. At a minimum, Shimose argued that issues of material fact surrounding HHSC/HMC's asserted rational relationships would preclude summary judgment in its favor.

On March 28, 2012, the circuit court granted HHSC/HMC's motion for summary judgment and denied Shimose's cross-motion for summary judgment. The Intermediate Court of Appeals (ICA) affirmed.

## II. STANDARD OF REVIEW

We review a circuit court's decision to grant a motion for summary judgment de novo under the standard that the circuit court should have applied. Fujimoto v. Au, 95 Hawaiʻi 116, 136, 19 P.3d 699, 719 (2001) (citation omitted). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." U.S. Bank Nat'l Ass'n v. Castro, 131 Hawaiʻi 28, 41, 313 P.3d 717, 730 (2013) (internal quotations and citations omitted). The evidence must be viewed in the light most

8

favorable to the party opposing summary judgment.  See Ralston v. Yim, 129 Hawaiʻi 46, 55-56, 292 P.3d 1276, 1285-86 (2013).

### III. DISCUSSION

HRS § 378-2 states: "It shall be an unlawful discriminatory practice . . . [f]or any employer to refuse to hire or employ . . . any individual . . . [b]ecause of . . . arrest and court record[.]"  However, HRS § 378-2.5 allows an employer to disqualify a job applicant based on his or her history of conviction, "provided that the conviction record bears a rational relationship to the duties and responsibilities of the position."  The issue in this case is whether, as a matter of law, HHSC/HMC established a rational relationship between Shimose's conviction for possession with intent to distribute crystal methamphetamine and the duties and responsibilities of a radiological technician at HMC.  We hold that it did not.

### A.   The Plain Language of HRS § 378-2.5

Our foremost obligation in construing a statute is to "give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself."  Hanabusa v. Lingle, 119 Hawaiʻi 341, 349, 198 P.3d 604, 612 (2008) (internal quotations and citations omitted).  In so doing, we are bound to give effect to all parts of a statute, "no clause, sentence, or word shall be construed as superfluous,

void, or insignificant." State v. Kaakimaka, 84 Hawaiʻi 280, 289-90, 933 P.2d 617, 626-27 (1997).

Several guidelines define the statutory phrase "rational relationship to the duties and responsibilities of the position," HRS § 378-2.5(a), which we previously interpreted in Wright v. Home Depot U.S.A., Inc., 111 Hawaiʻi 401, 142 P.3d 265 (2006). As stated in Wright, the rational relationship standard is not coextensive with the ultra-deferential rational basis test that is used in some equal protection cases. See Wright, 111 Hawaiʻi at 412 n.9, 142 P.3d at 276 n.9. Accordingly, we decline to adopt a standard under which virtually any conceivable state of facts could support an adverse employment decision. Rather, "the standard of rationality . . . must find some footing in the realities of the subject." Heller v. Doe, 509 U.S. 312, 321 (1993). As such, an adverse employment action cannot be justified by an asserted relationship that is so remote or "attenuated as to render the distinction arbitrary or irrational." Fitzgerald v. Racing Ass'n of Cent. Iowa, 539 U.S. 103, 106 (2003) (internal quotations and citation omitted). Negative attitudes toward politically unpopular ex-offenders do not, standing alone, justify adverse employment decisions. Cf. City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 446-47 (1985) (stating that a bare desire to harm a politically

unpopular group is not a legitimate state interest); <u>U.S. Dep't of Agric. v. Moreno</u>, 413 U.S. 528 (1973) (same).[8]

## B.  The Legislative History of HRS § 378-2.5

These guidelines are supported by the legislative history of HRS §§ 378-2 and 378-2.5, which reveals that the statutory scheme was tailored to balance competing state interests.  <u>See</u> <u>Life of the Land, Inc. v. City Council of City & Cnty. of Honolulu</u>, 61 Haw. 390, 447, 606 P.2d 866, 899 (1980) ("Courts may take legislative history into consideration in construing a statute.").  Here, the legislative history of HRS § 378-2.5 reveals that the legislature chose language broad enough to allow reasonable consideration of a record of conviction, but narrow enough to place a meaningful restraint on unlawful discrimination.  <u>See</u> S. Stand. Comm. Rep. No. 3282, in 1998 Senate Journal at 1331 ("The intent of this bill is to provide a balanced disclosure taking into account the interest of the employee and the employer.").

The fundamental restraint on discrimination against persons with conviction records embodied in HRS § 378-2 was passed into law in 1974 to reflect the legislature's recognition "that persons who have been in trouble are not inherently and permanently bad and that opportunities afforded other citizens

---

[8]    <u>See also</u> Elena Saxonhouse, <u>Unequal Protection: Comparing Former Felons' Challenges to Disenfranchisement and Employment Discrimination</u>, 56 Stan. L. Rev. 1597 (2004).

11

should be made available to them."  S. Stand. Comm. Rep. No. 862-74, in 1974 Senate Journal at 1079.  The purpose of HRS § 378-2 "is to encourage the rehabilitation of convicted persons by eliminating disqualification from employment . . . solely by reason of a prior conviction of a crime."  Id. (emphasis in original).  Convicted persons who are rehabilitated through meaningful employment show decreased levels of recidivism.[9]

In 1998, a bill introduced in the House proposed a dramatic policy reversal by deleting the phrase "court record" from HRS § 378-2.  This would have allowed employers to consider criminal convictions without restraint.  The House Standing Committee Report accompanying the bill stated:

> The purpose of this bill is to repeal the prohibition against employment discrimination based upon arrest and court record.
>
> . . . .
>
> Your Committee finds that under current law, it is an unlawful discriminatory practice in connection with employment to discriminate on the basis of an individual's arrest and court record.  Your Committee believes that the rehabilitation of individuals who may have run afoul of the law is essential to society and that gainful employment is necessary to the rehabilitative process.  Your Committee is concerned, however, that broad prohibitions restricting an employer's right to question a person regarding criminal convictions may compromise the safety of customers and employees.
>
> Upon careful consideration, your Committee has amended this measure by:
>
> . . . .

---

[9]  See, e.g., Matthew Makarios et al., Examining the Predictors of Recidivism Among Men and Women Released From Prison in Ohio, 37 Crim. Just. & Behav. 1377 (2010).

> (3) Limiting the prohibition against unlawful discriminatory practices in employment because of "arrest and court record" under Section 378-2(1), HRS, to "arrest records";
>
> (4) Adding a new definition of "Arrest record" to Section 378-1, HRS, which definition excludes records of criminal conviction, thereby effectively providing an exception to the prohibition against unlawful discriminatory practices in employment on the basis of an applicant's or current employee's record of criminal conviction[.]"

H. Stand. Comm. Rep. No. 673-98, in 1998 House Journal at 1300-01.

The House's proposal was opposed by the Senate Standing Committee, which issued a report that stated:

> Your Committee is concerned that this measure will diminish the employment opportunities for individuals who have a conviction record. Your Committee believes that it is in our State's best interest to see to it that these individuals not be discriminated against in their search for employment. Should these individuals be unable to secure employment and turn to public assistance or return to a life of crime, the costs will be borne by the public.
>
> Your Committee has amended this bill by:
>
> . . . .
>
> (2) Inserting a provision to allow employers to inquire about conviction records, provided that it is done so only after the employer makes a conditional offer of employment and that the conviction record bears a substantial relationship to the employment duties of the position that has been offered;
>
> (3) Inserting a provision that limits the inquiry to the past five years;
>
> (4) Inserting a requirement that the employer shall make an individualized assessment of the circumstances associated with the record of conviction and any evidence of rehabilitation to determine if the person is suitable for employment[.]

S. Stand. Comm. Rep. No. 2959, in 1998 Senate Journal at 1207-08.

Negotiations came down to the final day, and "agreement on th[e] measure was reached approximately one hour before the deadline." The resulting compromise, enacted as HRS § 378-2.5, allows consideration of a criminal conviction that bears a "rational relationship to the duties and responsibilities of the position." The statutory language adopted did not embody the House's proposal to allow unfettered consideration of criminal convictions. The legislature also rejected the Senate's proposal for a "substantial relationship" standard.[10] An overly broad reading of HRS § 378-2.5 would eviscerate the protections afforded to persons with conviction records by HRS §§ 378-2 and 2.5, and render the statutory phrase "duties and responsibilities" meaningless. That was not the bicameral intent of the enacting legislature.[11]

_____

[10] HRS § 378-2.5 also adopted the Senate's provision that requires employers to make a conditional job offer before inquiring into conviction history, but rejected the Senate's proposal that would have required employers to make an individualized assessment of the circumstances associated with an applicant's conviction history.

Another compromise embodied in HRS § 378-2.5 is the ten-year limitation on an employer's ability to consider convictions, which is five years longer than the limitation period that the Senate proposed, but decidedly shorter than the unlimited consideration proposed by the House. The limitation excludes periods of incarceration. See HRS § 378-2.5(c).

[11] We decline to adopt an unduly broad reading of "rational relationship" based on the remarks of individual House members that would undermine the compromise position reached by the legislature in full. See Wright, 111 Hawaiʻi at 411 n.8, 142 P.3d at 275 n.8 ("Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted for the bill.") (internal quotations and citation omitted); see also Dines v. Pac. Ins. Co., Ltd., 78 Hawaiʻi 325, 332, 893 P.2d 176, 183 (1995) ("Statements by legislators . . . need not reflect the purpose which a majority of the legislators believed is carried out by [a] statute.") (internal quotations and

(continued...)

**C.  HHSC/HMC Failed to Establish a Rational Relationship Between Shimose's Conviction and the Duties and Responsibilities of a Radiological Technician**

When presented with cross-motions for summary judgment in the context of HRS §§ 378-2 and 378-2.5, the court's task is

---

[11](...continued)
citation omitted)).  For example, the following statements of individual legislators have no bearing on our interpretation of the phrase "rational relationship":

Representative Tom stated:

> [T]he 'rational relationship' between the job and the conviction is the lowest standard you can look at.  We took that standard because 'rational' is a lot lower than 'substantial.'  'Rational' is a lot lower than 'reasonable.'  'Rational' is a very, very low and fair relationship to establish.

Representative Yamane stated:

> As far as the example that was given earlier, 'rational relationship', if the person is convicted of theft and the employer is concerned about the fellow employees, then theft has a definite bearing because employees that you hire you don't want them to steal from your fellow employees and not only from your own business.  I feel there can be a 'rational relationship' to most things that crimes would come under.

Representative Pendleton stated:

> It would be well for us to remember that our floor debate is going to be something that attorneys in the future look to.  We are creating an official record.  The intent of this body, and I just wanted to make it clear that, at least for my thinking, that I think that pretty much any conviction would bear a 'rational relationship' to job qualifications.
>
> . . . .
>
> And so I want the record to clearly reflect that just about any conviction, I think, if a person cannot live up to the rules established by the State of Hawaiʻi, the rules which set forth what is acceptable conduct in our State, if you cannot live up to that and you commit a crime and are duly convicted, I think that is going to bear on the employer/employee relationship.

H. Conf. Comm. Rep. No. 79, in 1998 House Journal at 769-771.

two-fold. First, the court must apprise itself of the undisputed material facts relating to the duties and responsibilities of the position. In so doing, the court is not necessarily limited to duties and responsibilities contained in a formal job description. Second, the court must analyze the rationality of any relationship that the defendant has asserted between the conviction and the employee's ability to perform his or her undisputed job duties.[12] Where factual issues bearing on the rationality of an asserted relationship remain, neither party is entitled to summary judgment.

Here, HHSC/HMC has asserted two rational relationships between Shimose's conviction and the responsibilities and duties of a radtech: (1) That radtechs have access to drugs, syringes, needles, and patient charts; and (2) that radtechs work with vulnerable patient groups who are at risk of having "their medication taken from them and/or [being] sold an illegal drug."[13] Before addressing those relationships, we briefly

_____

[12] This analysis must be tethered to the nature of the conviction. For example, a conviction resulting from elder abuse would bear a rational relationship to the duties and responsibilities of a position that required close contact with the elderly, but a drug-related conviction might not.

[13] Shimose argues that HHSC/HMC's asserted rational relationships should be disfavored because they were not introduced in response to his administrative claim before the HCRC. Although the defendant has the responsibility to posit rational relationships that motivated its employment decision, the nature of those relationships may be asserted for the first time before the trial court. Hypothetical relationships that did not, in fact, motivate an employment decision should be disregarded.

16

discuss the primary duties and responsibilities of a radtech.

1.    The Core Duties of a Radtech

Both HHSC's and HMC's formal job descriptions indicate that radtechs at HMC are primarily responsible for medical imaging and the preparation and maintenance of medical imaging equipment.  Other duties include preparing patients for imaging and making sure that they are comfortable with the imaging process.  HMC's radtechs also process, review, and transmit radiographic images.  There is no indication that radtechs at HMC administer or even assist patients with any type of drugs. A felony drug conviction simply has no bearing on an individual's ability to perform the primary imaging duties of a radtech at HMC.  Accordingly, there is no rational relationship between Shimose's drug conviction and the core duties of a radtech at HMC that would have entitled HHSC/HMC to disqualify Shimose from prospective employment.[14]

2.    Access to Controlled Substances, Non-Controlled Substances, Syringes and Needles, and Patient Charts

HHSC/HMC has contended that its radtechs "have access to an array of drugs and related materials such as syringes and needles."  Specifically, HHSC/HMC asserted that radtechs at its

---

[14]    Shimose argues that because he obtained licensure in radiology, his suitability for employment with HHSC/HMC cannot be questioned.  However, the fact that an individual has received licensing and/or professional certification does not conclusively establish the absence of a rational relationship between a conviction and the duties and responsibilities of a position.

17

facility have access to crash carts, drug reaction boxes, anesthesia carts, and hospital storage areas. HHSC/HMC also asserted that access to patient charts provides information that can be used to divert drugs.

In this case, HHSC/HMC has not presented undisputed facts that establish a rational relationship between a drug conviction and an HMC radtech's proximity to locked crash carts and drug reaction boxes. Although crash carts and drug reaction boxes at HMC contain syringes and needles, neither syringes nor needles are controlled items. Syringes and needles are readily and cheaply available to the public. Furthermore, an HMC radtech's potential access to the non-controlled substances contained in crash carts and drug reaction boxes does not bear a rational relationship to a drug conviction. There is no reason why an employee with a drug conviction would pose a risk because he or she has access to, among other things, sterile water, Benadryl, sodium bicarbonate (baking soda), Zantac, or the other substances contained in crash carts and drug reaction boxes. None of the drugs in the crash cart or the drug reaction boxes at HMC are regulated by the federal Controlled Substances Act, and HHSC/HMC presented no rebuttal evidence tending to establish that these substances are controlled in any way. See 21 U.S.C. § 812; 21 C.F.R. §§ 1308.11-1308.15.

Additionally, HHSC/HMC failed to establish the rationality of the relationship between a drug conviction and an HMC radtech's fitness to handle patient charts as a matter of law. HHSC/HMC failed to introduce undisputed material facts showing that access to a patient's chart would lead to access to controlled substances.

Finally, the relationship between a drug conviction and access to <u>controlled</u> substances may prove to be rational in this case.[15] Drug diversion is a serious problem at some hospitals, and the risk of diversion may, depending on the circumstances, rationally be increased by hiring an individual with a conviction for the sale of a controlled substance. However, diversion depends on access. See <u>Diversion of Drugs Within Health Care Facilities</u>, 87(7) Mayo Clinic Proc. at 674 ("[D]ata suggest[s] that ready access is a critical component of drug diversion from the health care facility workplace."). Issues of material fact remain surrounding HHSC/HMC's allegations that controlled substances might be present in anesthesia carts and storage areas. Issues of material fact also remain with respect to whether radtechs at HMC have a level of access to anesthesia carts, storage areas, and the hospital

---

[15] Subject to the general time limitations provided by HRS § 378-2.5(c) and the exemptions provided by HRS § 378-2.5(d), if applicable.

pharmacy that is rationally related to a prior felony drug conviction.[16]

3.   Interaction With Youthful, Elderly, and Otherwise Vulnerable Patients

HHSC/HMC asserts that there is a rational relationship between a drug conviction and the risk that vulnerable patients might have "their medication taken from them."  Although this relationship is somewhat speculative, if an HMC radtech's contact with patients involved a legally significant degree of access to controlled substances then it might create a rational relationship.  However, questions of material fact remain regarding how a radtech at HMC could obtain controlled substances from a patient in the course of his or her duties.  HHSC/HMC did not introduce undisputed evidence that its patients have physical control over controlled substances that might be diverted.  HHSC/HMC did not assert that its patients have access to quantities of pills, or that several doses of medication are ever left out in a patient's hospital room.  HHSC/HMC did not assert that its patients bring controlled substances with them when undergoing radiographic imaging.  HHSC/HMC merely asserted that there is a risk that vulnerable patients would have their medication taken.  In the absence of undisputed material facts

---

[16]   Shimose contends that a radtech's access to hospital areas containing controlled substances does not exceed that of the general public, a fact that if true would call into question the rationality of HHSC/HMC's "access" defense.

establishing access, HHSC/HMC was not entitled to summary judgment on this theory.

Additionally, genuine issues of material fact remain regarding the asserted relationship between Shimose's felony conviction and the risk that vulnerable patients "might be sold an illegal drug."  If HRS § 378-2.5 extended so broadly that any contact with the elderly or young children created a rational relationship to a prior drug conviction, then all individuals with prior drug convictions could be disqualified from any job that dealt with the public at large.  But drug convictions often have nothing to do with elder/child abuse, and should not serve as a blanket disqualification from employment that requires a modicum of interaction with children and the elderly.  Such a broad discriminatory prohibition would contradict the legislative compromise of HRS § 378-2.5.

### IV. CONCLUSION

In conclusion, the circuit court erred when it granted HHSC/HMC's motion for summary judgment with respect to Shimose's statutory claim.  Accordingly, we affirm in part and vacate in part the ICA's December 23, 2013 judgment on appeal and the circuit court's March 28, 2012 order granting HHSC/HMC's cross-

motion for summary judgment, and remand to the circuit court for further proceedings consistent with this opinion.[17]

Zak K. Shimose,
petitioner pro se

Sarah O. Wang
and Darin R. Leong
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Steven S. Alm



---

[17]    We affirm the grant of summary judgment in favor of HHSC/HMC with respect to Shimose's constitutional claim because Shimose cannot establish a liberty or property interest in prospective employment at HHSC/HMC. See Minton v. Quintal, 131 Hawaiʻi 167, 186, 317 P.3d 1, 20 (2013) ("[M]erely losing one position in a profession without being foreclosed from reentering the field is generally not sufficient to demonstrate an infringement of a liberty interest." (internal quotations and citation omitted)).

We also note that pursuant to HRS §§ 378-2.5(d) and 78-2.7(b), HHSC/HMC qualified for a statutory exception that allowed it to make a pre-offer inquiry into Shimose's conviction history on its general application form.