STUART, Justice.
 

 Justin Price, Charles D. James, Colonel Stone Johnson, James Armstrong, Georgia Gray Hampton, Walter Brown, Jr., Tommie Lee Houston, Frederick D. Richardson, Jr., and Kenneth P. Marshall (“the plaintiffs”), purporting to represent a class made up of Alabama voters, sued, in their official capacities, Attorney General Troy King, Lieutenant Governor Jim Folsom, Jr., President Pro Tempore of the Alabama Senate Hinton Mitchem, Speaker of the Alabama House Seth Hammett, and Secretary of State Beth Chapman (hereinafter collectively referred to as “the State defendants”), alleging that they failed to ensure that the current Alabama Constitution (“the 1901 Constitution”) was ever properly ratified. In fact, the plaintiffs allege, ratification of the 1901 Constitution was obtained only through voter fraud, and they therefore argue that, under 42 U.S.C. § 1983, the 1901 Constitution should be declared void and that an injunction should be entered prohibiting the State defendants from enforcing the provisions of the 1901 Constitution. The trial court denied the State defendants’ motion to dismiss the plaintiffs’ action; the State defendants now petition this Court for a writ of mandamus directing the trial court to dismiss the action. We grant the petition and issue the writ.
 

 I.
 

 On February 4, 2009, the plaintiffs initiated this action by filing a complaint in the Bessemer Division of the Jefferson Circuit Court. The gravamen of their complaint was the allegation that, in 1901, election officials in 12 “black belt counties”
 
 [1]
 
 manipulated election returns to ensure that the 1901 Constitution received sufficient votes to be ratified. The plaintiffs supported their complaint with the affidavit of Wayne Flynt, a professor of history at Auburn University. Flynt stated in his affidavit that the goal of the Constitutional Convention of 1901 was to produce a new constitution to maintain white supremacy in the government of Alabama and that the constitution drafted at the convention sought to achieve that end by disenfranchising African-American citizens through the use of poll taxes and residency, literacy, and property-owning requirements. The 1901 Constitution was ultimately ratified by a statewide vote of 108,613 to 81,734 on the strength of the vote in 12 black belt counties that voted in favor of ratification 36, 224 to 5,471, notwithstanding the fact that the majority of voters in those counties at that time was African-American and that the ratification of the 1901 Constitution was largely contrary to the interests of African-Americans. Flynt states that African-Americans in other parts of Alabama voted overwhelmingly against the ratification of the 1901 Constitution and that it is far more likely that the election returns in the 12 black belt counties were the product of fraud than a desire on the part of the African-American voters in those black belt counties, in effect, to disenfranchise themselves. He accordingly concludes that the 1901 Constitution was never properly ratified, and the plaintiffs in their complaint have adopted his argument and reasoning, asking the court to declare the 1901 Constitution void and to issue a permanent injunction prohibiting the State
 
 *1058
 
 defendants from seeking to enforce its provisions.
 

 Upon receiving the plaintiffs’ complaint, the State defendants moved to transfer the action to the Montgomery Circuit Court and, after the plaintiffs consented to the transfer, the trial court transferred the case on April 28, 2009. The State defendants thereafter filed an answer and moved to dismiss the complaint, arguing generally that the trial court lacked subject-matter jurisdiction and that the plaintiffs had failed to state a claim upon which relief could be granted. On October 7, 2009, the trial court entered an order granting the State defendants’ motion to dismiss; however, on October 9, 2009, the trial -court vacated that order and scheduled a hearing for November 3, 2009. On October 16, 2009, the plaintiffs filed a motion opposing the State defendants’ motion to dismiss and, on October 30, 2009, the State defendants filed their reply brief. At the conclusion of the November 3, 2009, hearing, the trial court entered an order denying the State defendants’ motion to dismiss.
 

 On November 24, 2009, the State defendants petitioned this Court to issue a writ of mandamus directing the trial court to dismiss the plaintiffs’ action. On January 27, 2010, we ordered the plaintiffs to file a response. The plaintiffs filed their response on February 11, 2010, the day after filing an amended complaint in the trial court modifying the putative class to include only African-American voters in Alabama, and identifying with more particularity the injuries they alleged they had suffered.
 
 [2]
 
 The State defendants filed their response to the plaintiffs’ petition on February 17, 2010.
 

 II.
 

 “As this Court has consistently held, the writ of mandamus is a
 

 “ ‘ “drastic and extraordinary writ that will be issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.” ’
 

 “Ex parte Wood,
 
 852 So.2d 705, 708 (Ala.2002) (quoting
 
 Ex parte United Serv. Stations, Inc.,
 
 628 So.2d 501, 503 (Ala.1993)). ‘ “In reviewing the denial of a motion to dismiss by means of a mandamus petition, we do not change our standard of review....” ’
 
 Drummond Co. v. Alabama Dep’t of Transp.,
 
 937 So.2d 56, 57 (Ala.2006) (quoting
 
 Ex parte Haralson,
 
 853 So.2d 928, 931 (Ala.2003)).
 

 “Tn
 
 Newman v. Savas,
 
 878 So.2d 1147 (Ala.2003), this Court set out the standard of review of a ruling on a motion to dismiss for lack of subject-matter jurisdiction:
 

 “ ‘ “A ruling on a motion to dismiss is reviewed without a presumption of correctness.
 
 Nance v. Matthews,
 
 622 So.2d 297, 299 (Ala.1993). This Court must accept the allegations of the complaint as true.
 
 Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C.,
 
 828 So.2d 285, 288 (Ala.2002). Furthermore, in reviewing a ruling on a motion to dismiss we will not consider whether the pleader will ultimately prevail but whether the pleader may possibly prevail.
 
 Nance,
 
 622 So.2d at 299.”
 

 “ ‘878 So.2d at 1148-49.’
 
 *1059
 

 “Pontius v. State Farm Mut. Auto. Ins. Co.,
 
 915 So.2d 557, 563 (Ala.2005). We construe all doubts regarding the sufficiency of the complaint in favor of the plaintiff.
 
 Drummond Co.,
 
 937 So.2d at 58.”
 

 Ex parte Alabama Dep’t of Transp.,
 
 978 So.2d 17, 20-21 (Ala.2007).
 

 III.
 

 In their petition for the writ of mandamus, the State defendants argue that the trial court erred in failing to dismiss the plaintiffs’ complaint because, they allege, the trial court does not have subject-matter jurisdiction.
 
 [3]
 
 The trial court lacks subject-matter jurisdiction, the State defendants argue, because: (1) the plaintiffs lack standing; (2) there is no statute that authorizes an “election contest” such as this; and (3) the complaint raises a nonjus-ticiable political question. As explained subsequently, we agree that the plaintiffs lack standing; accordingly, we need not consider the State defendants’ latter two arguments at this time.
 

 In
 
 Town of Cedar Bluff v. Citizens Caring for Children,
 
 904 So.2d 1253, 1256 (Ala.2004), this Court explained the standing requirement as follows:
 

 “ ‘To say that a person has standing is to say that that person is the proper party to bring the action. To be a proper party, the person must have a real, tangible legal interest in the subject matter of the lawsuit.’
 
 Doremus v. Business Council of Alabama Workers’ Comp. Self-Insurers Fund,
 
 686 So.2d 252, 253 (Ala.1996). ‘Standing ... turns on “whether the party has been injured in fact and whether the injury is to a legally protected right.” ’
 
 [State v. Property at] 2018 Rainbow Drive,
 
 740 So.2d [1025,] 1027 [ (Ala.1999) ] (quoting
 
 Romer v. Board of County Comm’rs of the County of Pueblo,
 
 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting)) (emphasis omitted). In the absence of such an injury, there is no case or controversy for a court to consider. Therefore, were a court to make a binding judgment on an underlying issue in spite of absence of injury, it would be exceeding the scope of its authority and intruding into the province of the Legislature. See
 
 City of Daphne v. City of Spanish Fort,
 
 853 So.2d 933, 942 (Ala.2003) (‘The power of the judiciary ... is “the power to declare finally the rights of the parties, in a particular case or controversy....” ’ (quoting
 
 Ex parte Jenkins,
 
 723 So.2d 649, 656 (Ala.1998)));
 
 Allen v. Wright,
 
 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (‘[T]he law of Art. Ill standing is built on a single basic idea — the idea of separation of powers.’).”
 

 Traditionally, Alabama courts have focused primarily on the injury claimed by the aggrieved party to determine whether that party has standing; however, in 2003 this Court adopted the following, more precise, rule regarding standing based upon the test used by the Supreme Court of the United States:
 

 “A party establishes standing to bring a [constitutional] challenge ... when it demonstrates the existence of (1) an actual, concrete and particularized ‘injury in fact’ — ‘an invasion of a legally protected interest’; (2) a ‘causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be ‘redressed by a favorable decision.’
 
 Lujan v. Defenders of Wildlife,
 
 504 U.S. 555, 560-61, 112 S.Ct. 2130,
 
 *1060
 
 119 L.Ed.2d 351 (1992). A party must also demonstrate that ‘he is a proper party to invoke judicial resolution of the dispute and the exercise of the court’s remedial powers.’
 
 Worth [v. Seldin
 
 ], 422 U.S. [490,] 518, 95 S.Ct. 2197 [(1975)].”
 

 Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C.,
 
 890 So.2d 70, 74 (Ala.2003).
 
 [4]
 
 Accordingly, we first consider whether the plaintiffs have demonstrated the existence of an actual, concrete, and particularized injury in fact.
 

 In paragraph 30 of their amended complaint,
 
 [5]
 
 the plaintiffs describe their alleged injuries as follows:
 

 “Plaintiffs and the class, as a result, have been deprived of the right to vote on their form of State Government in violation of the Fifteenth Amendment and have been deprived of their Fourteenth Amendment procedural due process and equal protection rights in never being allowed to effectively vote on the invalid constitution. Plaintiffs and the class have been deprived of their Fourteenth Amendment right to equal protection in other ways as well in that the racially-motivated and fraudulent or fraudulently-procured ratification of the 1901 constitution effectively excluded blacks from participation in elections; and even after the legal removal of the formal barriers to blacks voting in elections, the 1901 constitution’s perpetuation causes plaintiffs and the class stigmatic and representational or expressive harms, by continuing to stigmatize plaintiffs and the class, to incite racial hostility, to reinforce racial stereotypes (such as that plaintiffs and the members of the class think alike, share the same political interests, and will prefer the same candidates at the polls), and to signal to elected representatives that they repre
 
 *1061
 
 sent the white majority and not their constituency (including plaintiffs and the class) as a whole.”
 

 Thus, the plaintiffs essentially allege that they have suffered two distinct injuries: (1) that they have been deprived of a constitutional right to vote on the constitution establishing their form of state government; and (2) that they have suffered “stigmatie and representational or expressive harms” inasmuch as, they allege, the perpetuation of the 1901 Constitution stigmatizes all African-American voters, incites hostility against them, reinforces stereotypes, and signals to elected officials that they do not represent their African-American constituency. The State defendants argue that neither of these claimed injuries are actual, concrete, and sufficiently particularized so as to provide the plaintiffs with standing.
 

 The first injury alleged by the plaintiffs does not provide a basis for standing because it is readily apparent that the alleged injury is, in fact, no injury at all. There is no right that would grant to each generation of Alabamians the opportunity to vote on the then existing constitution any more than there is a right given to each generation of Americans to vote on the United States Constitution. Although there may be evidence indicating that the voting rights of some African-American voters in Alabama were infringed in connection with the ratification vote in 1901, we may safely conclude, based upon the passage of time, that none of those voters are presently before this Court. Accordingly, because none of the plaintiffs or members of the putative class had their
 
 own
 
 voting rights infringed in 1901, none of them have suffered a particularized injury that affects him or her “in a personal and individual way.”
 
 Lujan v. Defenders of Wildlife,
 
 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). See also
 
 In re African-American Slave Descendants Litigation,
 
 471 F.3d 754, 759 (7th Cir.2006) (“[T]he wrong to the ancestor is not a wrong to the descendants.”).
 

 The second injury the plaintiffs allege is the stigmatie and representational harms they claim to have suffered as a result of the perpetuation of the 1901 Constitution. In support of their argument that these injuries are sufficiently concrete and particularized to provide them with standing, the plaintiffs cite a series of decisions by the Supreme Court of the United States concerning gerrymandering and congressional redistricting in which these types of harms are discussed.
 
 Shaw v. Reno,
 
 509 U.S. 630, 647-48, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), is representative of these cases:
 

 “A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group— regardless of their age, education, economic status, or the community in which they live — think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes. See,
 
 e.g., Holland v. Illinois,
 
 493 U.S. 474, 484, n. 2 (1990) (‘[A] prosecutor’s assumption that a black juror may be presumed to be partial simply because he is black ... violates the Equal Protection Clause’ (internal quotation marks omitted)); see also
 
 Edmonson v. Leesville Concrete Co.,
 
 500 U.S. 614, 630-631 (1991) (‘If our society is to continue to progress as a multiracial democracy, it
 
 *1062
 
 must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury.’). By perpetuating such notions, a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract.
 

 “The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole.”
 

 The State defendants appear to concede that, in certain circumstances, stigmatic and representational harms may be sufficient to support standing; however, they argue that those circumstances do not exist in the instant case because the plaintiffs are essentially arguing that they are being stigmatized as a result of certain African-American voters having been deprived of their equal-protection rights in 1901, not as a result of the plaintiffs themselves being deprived of those rights. Indeed, the State defendants argue, the plaintiffs cannot claim that they personally were deprived of them voting rights in 1901 because they were not voters at that time. We agree. In cases where stigma has been recognized as an injury for standing purposes, it is the plaintiff who has suffered discrimination or who has been denied equal protection. The Supreme Court of the United States articulated this principle in
 
 Allen v. Wright,
 
 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), when it stated:
 

 “Neither do [the appellees] have standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination. There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing. See
 
 Heckler v. Mathews,
 
 465 U.S. 728, 739-740 (1984).
 
 Our cases make clear, however, that such injury accords a basis for standing only to ‘those persons who are personally denied equal treatment’ by the challenged discriminatory conduct, ibid.”
 

 (Emphasis added.) The Supreme Court has discussed stigmatic harm on several occasions since
 
 Allen;
 
 however, as one author has noted, “[i]n the twenty-three years since it was decided,
 
 Allen
 
 has never been openly questioned by the Court.” Thomas Healy,
 
 Stigmatic Ham and Standing,
 
 92 Iowa L.Rev. 417, 431 (2007). Therefore, because the plaintiffs were not “personally denied equal treatment,” they have not suffered the particularized injury that standing requires, and their action against the State defendants should, accordingly, be dismissed.
 

 IV.
 

 The plaintiffs sued the State defendants alleging that the State defendants had failed to ensure that the 1901 Constitution was ever properly ratified. The State defendants moved to dismiss the action, arguing, among other things, that the plaintiffs lacked standing to bring their claims. The trial court denied that motion; however, as discussed
 
 supra,
 
 the trial court erred by doing so because the State defendants have established a clear legal right to the relief they seek. The State defendants’ petition for a writ of mandamus is accordingly granted, and the trial court is hereby directed to vacate its order denying the State defendants’ motion to dismiss and to enter an order granting the motion and dismissing the action.
 

 
 *1063
 
 PETITION GRANTED; WRIT ISSUED.
 

 LYONS, WOODALL, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ„ concur.
 

 COBB, C.J., concurs in the result.
 

 [1]
 

 . The 12 black belt counties are not identified in the materials submitted to this Court.
 

 [2]
 

 . The filing of a petition for the writ of mandamus does not divest the trial court of jurisdiction or stay the case.
 
 State v. Webber,
 
 892 So.2d 869, 871 (Ala.2004).
 

 [3]
 

 . Before the trial court, the State defendants also argued that the plaintiffs’ complaint should be dismissed on several nonjurisdic-tional grounds as well. However, their petition to this Court raises only the previously made jurisdictional arguments.
 

 [4]
 

 . The plaintiffs argue that this Court has applied the three-pronged standing test adopted in
 
 Henri-Duval
 
 on only limited occasions and has instead largely continued to use the simpler traditional test of " ‘whether the party has been injured in fact and whether the injury is to a
 
 legally protected right.'
 
 ”
 
 State v. Property at 2018 Rainbow Drive,
 
 740 So.2d 1025, 1027 (Ala.1999) (quoting
 
 Romer v. Board of County Comm'rs of the County of Pueblo,
 
 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting)). See, e.g.,
 
 Ex parte Synovus Trust Co., N.A.,
 
 41 So.3d 70 (Ala.2009). Accordingly, the plaintiffs urge this Court to apply that traditional test in this case and to, in effect, not consider the latter two prongs of the test articulated in
 
 Henri-Duval.
 

 However, although the plaintiffs are correct that, even
 
 post-Henri-Duval,
 
 this Court has sometimes addressed only the injury-in-fact prong of the three-pronged test articulated in
 
 Henri-Duval,
 
 we have clearly indicated on at least two occasions that the three-pronged test is the appropriate test for determining standing in Alabama. See
 
 Muhammad v. Ford,
 
 986 So.2d 1158, 1162 (Ala.2007) (stating that, in
 
 Henri-Duval,
 
 “this Court adopted a more precise rule regarding standing”); and
 
 Town of Cedar Bluff,
 
 904 So.2d at 1256 ("In
 
 [Henri-Duval'],
 
 this Court effectively restated the standard [for standing]_”). In
 
 Ex parte Synovus Trust Co.
 
 and other cases decided
 
 post-Henri-Duval
 
 in which only the injury-in-fact prong of the test is addressed, it is generally because the only question at issue in those cases was whether the plaintiff had suffered a particularized injury in fact.
 

 [5]
 

 . The State defendants argue that we should conduct our standing analysis based on the plaintiffs’ original complaint as opposed to their amended complaint because, they argue, jurisdictional defects cannot be cured by amending the complaint. In support of their argument they cite
 
 Cadle Co. v. Shabani, 4
 
 So.3d 460, 463 (Ala.2008), in which we stated that “[t]he jurisdictional defect resulting from the plaintiff’s lack of standing cannot be cured by amending the complaint to add a party having standing.” However,
 
 Cadle
 
 is inapposite here because the plaintiffs have not amended their complaint to add parties; rather, they have amended it to subtract parties. Importantly, all the plaintiffs included in the amended complaint were included in the original complaint.