PER CURIAM.
Johnny Mack Morrow, a member of the Alabama House of Representatives, and Jim Zeigler, auditor for the State of Alabama (hereinafter collectively referred to as "the plaintiffs"), appeal from a judgment of the Montgomery Circuit Court ("the trial court") dismissing their complaint filed against Robert Bentley, individually and in his official capacity as governor of the State of Alabama; Gunter Guy, individually and in his official capacity as commissioner of the Alabama Department of Conservation and Natural Resources; Luther Strange, individually and in his official capacity as attorney general for the State of Alabama; William Newton, individually and in his official capacity as director of the Alabama Department of Finance; and Cooper Shattuck, individually and in his official capacity as executive director of the University of Alabama System's Gulf State Park Project (hereinafter collectively referred to as "the defendants").
*281 [1]
Facts and Procedural History
On July 25, 2016, Morrow, individually and in his official capacity as a State representative, and Zeigler, individually and in his official capacity as State Auditor, sued the defendants. Relevant to the plaintiffs' claims is the Gulf State Park Projects Act, codified at § 9-14E-1 et seq., Ala. Code 1975 ("the Act"), which was enacted to facilitate the construction of a hotel/conference center in Gulf State Park ("the project"). See § 9-14E-1(9), Ala. Code 1975. Regarding funding for the project, the Act provides:
"Other than project revenues, only National Resource Damage Assessment funds or Restore Act funds may be expended to implement this chapter. If the State of Alabama does not receive or has not been awarded any National Resource Damage Assessment funds or Restore Act funds for the purposes of this chapter by December 31, 2015, this chapter is repealed on January 1, 2016."
§ 9-14E-9, Ala. Code 1975.
It appears that Alabama received National Resource Damage Assessment funds before December 31, 2015. However, the United States District Court for the Southern District of Alabama ("the district court") entered an order in February 2016 enjoining the use of those funds on the project until the defendants in the district court complied with certain federal requirements.[2] The plaintiffs' complaint alleged that, given the district court's order, the defendants were "[w]ithout any lawful funds to spend upon the [p]roject." Nevertheless, the plaintiffs alleged, the defendants "boldly, unlawfully and hastily proceeded" to fund the project with moneys received from British Petroleum Exploration & Production, Inc. ("BP"), as a result of the 2010 Deepwater Horizon oil spill in the Gulf of Mexico. According to the complaint, those funds are "neither National Resource Damage Assessment funds, nor Restore Act funds, nor Project revenues," and, thus, the complaint alleged, "State funds ... are now being expended and disbursed by [the defendants] daily in a manner that is unconstitutional and unlawful because none are derived from any source of funds allowed by Alabama law to be so expended or disbursed" on the project. The complaint further alleged that the defendants' funding of the project with moneys not authorized by the Act constituted a usurpation of the appropriation power of the legislature.
Given those allegations, the plaintiffs' complaint asserted three declaratory-judgment counts. Count I sought a judgment declaring that the defendants "have unlawfully disbursed and expended ... state funds"; "restrain[ing] further unconstitutional and illegal expenditures and disbursements of state funds"; and requiring the defendants "to account ... for any and all sums they have unconstitutionally and/or illegally disbursed or expended." Count II sought a judgment declaring that the Act has been repealed by virtue of § 9-14E-9 and, thus, that the project "cannot lawfully continue." Count III sought a judgment declaring that the defendants "have unlawfully 'appropriated'
*282 funds in violation of Constitution of Alabama of 1901"; enjoining the defendants "from continuing to violate ... constitutional and statutory provisions"; "requiring an accounting ... of all ... unconstitutional and unlawful disbursements and expenditures"; and "requiring restoration ... of ... all state funds ... unconstitutionally and unlawfully expended."
The defendants filed a motion to dismiss in which they asserted, among other defenses, that the plaintiffs lacked standing to prosecute their action in either their individual or official capacities.[3] In their brief in support of the motion, the defendants alleged that the plaintiffs' complaint was the "second assault made ... upon the [project]" in the trial court. In support of that allegation, the defendants attached to their motion a copy of a complaint filed against the defendants in April 2016 by Charles Grimsley, in his individual capacity as a taxpayer, in which Grimsley made essentially the same allegations and sought essentially the same relief the plaintiffs seek in this case.[4] The defendants also attached a copy of a motion to dismiss they had filed in Grimsley's case in which they argued that Grimsley lacked standing to prosecute his action in his capacity as a taxpayer because he failed to allege that funding the project with moneys received from BP would cause him to "suffer the liability of replenishing the state treasury through increased taxes." On July 22, 2016, the trial court, Judge Truman M. Hobbs, dismissed Grimsley's complaint without stating a reason for the dismissal.
In their motion to dismiss the plaintiffs' complaint in this case, the defendants argued that the only distinction between Grimsley's complaint and the plaintiffs' complaint is that Grimsley brought his complaint in his individual capacity as a taxpayer and the plaintiffs brought their action in both their individual and their official capacities. As to the plaintiffs' standing in their individual capacities, the defendants argued that the plaintiffs, like Grimsley, had failed to allege that funding the project with moneys received from BP would result in a probable increase in their tax burden and, thus, that they lacked standing to prosecute their action in their capacities as taxpayers. As to the plaintiffs' standing in their official capacities, the defendants argued that the plaintiffs' "representative capacity has [no] legal effect" on a determination of standing and "confers [no] special right upon [them]" to prosecute their action. The defendants further argued that the moneys funding the project are the "legal equivalent of federal funds or private grant funds," and, their argument continued, "[i]t is axiomatic that the Alabama Legislature cannot appropriate these funds or control or interfere with the manner in which they are spent."
The plaintiffs filed a reply to the motion to dismiss, but they failed to respond to the defendants' argument that they lacked standing in their individual capacities as taxpayers. Instead, the plaintiffs argued that, "[u]nlike ordinary tax paying citizens, [the plaintiffs] are elected state officials whose standing does not require a showing that the funds being used ... are tax dollars." In response to the defendants' argument that the moneys funding the project were the equivalent of federal or *283 private-grant funds, the plaintiffs argued that the moneys were nevertheless "state funds subject to appropriation by the state Legislature." Thus, the plaintiffs argued, Zeigler, as State Auditor, was tasked with auditing the State's finances, and Morrow, as a member of the legislature, had standing to prosecute an action to ensure that the defendants "follow the law and not usurp constitutional and statutory powers afforded" the plaintiffs.
The trial court, Judge Gregory O. Griffin, Sr., held a hearing on the defendants' motion to dismiss and subsequently entered a judgment on September 15, 2016, dismissing the complaint on the ground that the plaintiffs lacked standing to prosecute the action. The plaintiffs, arguing that they have standing in both their individual capacities as taxpayers and in their official capacities, timely appealed. We affirm.
Discussion
I. The Plaintiffs' Standing as Taxpayers
Initially, we note that " '[t]he issue of standing presents a pure question of law, and the trial court's ruling on that issue is entitled to no deference on appeal.' " Town of Mountainboro v. Griffin, 26 So.3d 407, 409 (Ala. 2009) (quoting Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 953 (Ala. 2004) ). The plaintiffs first argue that they have standing to prosecute their action in their individual capacities as taxpayers. However, the plaintiffs waived that argument by not presenting it to the trial court. See Allsopp v. Bolding, 86 So.3d 952, 962 (Ala. 2011) ("It is well settled that an appellate court may not hold a trial court in error in regard to theories or issues not presented to that court.").
At the hearing on the defendants' motion to dismiss, the defendants argued (as they did in their motion) that the plaintiffs lacked standing to prosecute their action in their individual capacities as taxpayers. However, just as the plaintiffs did not respond to that argument in their reply to the motion to dismiss, the plaintiffs' attorney did not respond to that argument at the hearing. Instead, the plaintiffs' attorney argued only that the plaintiffs had standing in their official capacities and, in fact, expressly indicated to the trial court at the beginning of the hearing that the plaintiffs were not asserting the same standing ground Grimsley had asserted, i.e., taxpayer standing:
"[Plaintiffs' attorney]: Your Honor, the first thing that I think I need to reply to is what [the defendants' attorney] said about this being the same case that's been in front of Judge Hobbs. We could not disagree more.
"Charles Grimsley filed an action that was assigned to Judge Hobbs as a taxpayer.... He was saying [that] as a taxpayer of Alabama he [had] standing. And Judge Hobbs simply said that a taxpayer did not have standing.
"... And now [the plaintiffs] are ... in a separate case alleging totally separate bases for standing from what Grimsley had ...."
(Emphasis added.)
At the close of the hearing, the plaintiffs' attorney reiterated that the plaintiffs were not asserting the same standing ground Grimsley had asserted but, instead, were asserting that they had standing solely in their official capacities:
"[Plaintiffs' attorney]: [The defendants' attorney] likes to come back to this taxpayer revenue, taxpayer standing issue because he was successful with that in front of Judge Hobbs. This is not the same case. These are not the same claims. The plaintiffs in this case are uniquely situated as elected officials to challenge the use of public moneys, Alabama's *284 money, by these defendants without legislative appropriation."
(Emphasis added.)
It is true that the plaintiffs filed their action both in their individual capacities as taxpayers and in their official capacities and, thus, in one sense, "presented" the "taxpayer-standing" theory to the trial court. Allsopp, supra. However, it is evident that the plaintiffs not only failed to assert that theory in their response to the motion to dismiss and at the hearing on that motion but also expressly abandoned that theory at the hearing. It is also evident that the trial court was under the impression that the plaintiffs were asserting their standing only in their official capacities, regardless of the substance of their complaint. The trial court's judgment states, in pertinent part:
"[The plaintiffs], in both their individual and official capacities, assert their claims against the Defendants. However, their arguments and authorities submitted in opposition to the Motion to Dismiss address only the contention that ... Morrow in his capacity as a member of the Alabama House of Representatives and ... Zeigler in his capacity as the Auditor of the State of Alabama, have standing to assert the claims set out in the Complaint by virtue of those 'official capacities.'
"....
"As noted, the Plaintiffs base their claims that they have standing to bring this action solely as a product of their official capacities."
(Emphasis added.)
Nevertheless, the plaintiffs now seek to hold the trial court in error for refusing to find that the plaintiffs had standing in their individual capacities as taxpayers. However, for this Court to hold the trial court in error on that issue would be, given the above, to hold it in error with respect to an issue not presented to it. Allsopp, supra.
We recognize, of course, that the issue of lack of standing may not be waived. RLI Ins. Co. v. MLK Ave. Redevelopment Corp., 925 So.2d 914, 918 (Ala. 2005). This is so because "[t]he question of standing implicates the subject-matter jurisdiction of the court." Bernals, Inc. v. Kessler-Greystone, LLC, 70 So.3d 315, 319 (Ala. 2011). Thus, if a judgment is entered in favor of a plaintiff and the defendant either challenges the plaintiff's standing for the first time on appeal or fails to raise the issue altogether, this Court will not hold that the issue of the plaintiff's standing was waived. Ex parte Simpson, 36 So.3d 15, 25 (Ala. 2009) (noting that "this Court is duty-bound to notice and address the absence of standing and hence subject-matter jurisdiction ex mero motu" (emphasis added)). Rather, this Court must address the alleged lack of standing because the refusal to consider an issue that potentially deprives a trial court of subject-matter jurisdiction could result in the affirmance of a void judgment. Bernals, 70 So.3d at 319 ("When a circuit court lacks subject-matter jurisdiction, all orders and judgments entered in the case, except an order of dismissal, are void ab initio.").
However, that is not the case here. Because the trial court's judgment dismissed the complaint on the ground that the plaintiffs lacked standing, there is no judgment that might have been improperly entered in the absence of subject-matter jurisdiction. Bernals, supra. Thus, this Court does not risk affirming a void judgment by refusing to address the plaintiffs' taxpayer-standing argument. As a result, this Court is under no duty, as it would be in a case where a judgment had been entered in favor of a plaintiff who lacked standing, to consider the abandoned theory that the plaintiffs have taxpayer standing. Compare *285 Ex parte Simpson supra with Blevins v. Hillwood Office Ctr. Owners Ass'n, 51 So.3d 317, 322-23 (Ala. 2010) (holding, in a case where the plaintiffs "suggest[ed] no legal theory on which standing might be based" that it is not this Court's function to 'embark on its own expedition' ... in search of such a basis" and that "just because the Court is duty bound to notice the absence of subject-matter jurisdiction, it does not follow that it is so bound to construct theories ... to support the existence of jurisdiction for plaintiffs who choose to stand mute in the face of a serious jurisdictional challenge" (quoting Crutcher v. Williams, 12 So.3d 631, 635 (Ala. 2008) )). Accordingly, we decline to address the plaintiffs' argument, made for the first time on appeal, that they have standing to prosecute their action in their individual capacities as taxpayers. This is consistent with the long-standing principle of appellate review that we will not reverse a trial court's judgment on a matter that was not first presented to it for its consideration. Allsopp, supra.
II. The Plaintiffs' Standing in Their Official Capacities
A. Zeigler's Standing in His Capacity as State Auditor
In support of their argument that Zeigler has standing to prosecute the plaintiffs' action in his official capacity as State Auditor, the plaintiffs cite City Council of Prichard v. Cooper, 358 So.2d 440 (Ala. 1978), and City of Brundidge v. Alabama Department of Environmental Management, 218 So.3d 798 (Ala. Civ. App. 2016).
In Prichard, this Court held that the mayor of the City of Prichard had standing in his capacity as mayor to prosecute a declaratory-judgment action challenging the manner in which members of the city council were conducting business because the members' conduct raised "questions concerning [the mayor's] duties under statutory law." Prichard, 358 So.2d at 441. Similarly, in Brundidge, the Court of Civil Appeals held that the City of Brundidge had standing to prosecute a declaratory-judgment action challenging the Coffee County Commission's acquisition and operation of a landfill because the city alleged that the Coffee County Commission had "interfered with [the city's] statutory obligations" to manage solid waste within the city limits of Brundidge. Brundidge, 218 So.3d at 808. Thus, in each of those cases, the plaintiffs (though not State officials) had standing to prosecute a declaratory-judgment action alleging an interference with or usurpation of their statutory authority. Relying on those two cases, the plaintiffs argue that Zeigler has standing in his official capacity to seek a judgment "declaring that the [defendants] must follow the law and not usurp the constitutional and statutory powers conferred upon [him]" as State Auditor. Plaintiffs' brief, at 29.
Regarding Zeigler's statutory powers as State Auditor, the complaint contends that, under § 36-16-1 et seq., Ala. Code 1975, Zeigler "has the right, duty, and statutory and constitutional obligations to audit records of the State Treasurer and the Department of Finance." Regarding Zeigler's constitutional powers as State Auditor, the complaint cites multiple sections of the Alabama Constitution of 1901. However, the only cited section that addresses Zeigler's authority as State Auditor is Art. V, § 137, which provides, in pertinent part, as quoted in the complaint:
" 'The state treasurer and state auditor shall, every year, at a time fixed by the legislature, make a full and complete report to the governor, showing the receipts and disbursements of every character, all claims audited and paid out, by items, and all taxes and revenues collected and paid into the treasury, and the sources thereof.' "
*286 According to the plaintiffs, Zeigler has statutory and constitutional powers to audit the records of the State Treasurer and the Department of Finance and to report annually to the governor regarding the State's fiscal condition and those powers bestow upon him "unique standing" to "protect the State ... and its citizens from [the defendants'] unconstitutional and illegal disbursements of state funds." However, to establish standing, a plaintiff must " 'demonstrate[ ] the existence of ... an actual, concrete and particularized "injury in fact"-"an invasion of a legally protected interest." ' " Ex parte King, 50 So.3d 1056, 1059 (Ala. 2010) (quoting Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C., 890 So.2d 70, 74 (Ala. 2003), quoting in turn Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). Unlike the plaintiffs in Prichard and Brundidge, the plaintiffs here did not allege that the defendants' allegedly unlawful expenditures interfered with or infringed upon Zeigler's ability to fulfill his statutory and constitutional duties of auditing certain State records and of reporting annually to the governor regarding the State's fiscal condition.[5] That is to say, although the complaint belabored the allegation that the defendants' actions constitute an "ongoing harm to the treasury of the State of Alabama" (emphasis added), the complaint did not allege that the defendants' actions constitute an "ongoing harm" to Zeigler by interfering with or usurping his authority as State Auditor. The plaintiffs' failure to allege that Zeigler suffered an injury in fact in the form of an intrusion upon or usurpation of his statutory and/or constitutional authority as State Auditor is fatal to the plaintiffs' argument that Zeigler has standing to prosecute their action in his official capacity. Accordingly, the trial court did not err in finding that Zeigler lacked standing to prosecute the plaintiffs' action in his capacity as State Auditor.[6]
B. Morrow's Standing in His Capacity as a Member of the Legislature
As noted above, the plaintiffs alleged that the defendants' funding of the *287 project (1) violated the Act because, they say, none of the funds "now being expended and disbursed ... are derived from any source of funds allowed by [the Act] to be so expended or disbursed" on the project and (2) operated to usurp the legislature's appropriation power by funding the project "without a lawful appropriation by the State Legislature." Thus, the plaintiffs argue, the defendants' alleged refusal to comply with previously enacted legislation and the alleged usurpation of the legislature's appropriation power establishes Morrow's standing to prosecute the plaintiffs' action in his capacity as a member of the legislature.
As set forth above, in order to demonstrate that he has standing to prosecute the plaintiffs' action in his capacity as a legislator, Morrow must " 'demonstrate[ ] the existence of ... an actual, concrete and particularized "injury in fact"-"an invasion of a legally protected interest." ' " King, 50 So.3d at 1059. "Legislators have no special right to standing simply by virtue of their status: like other plaintiffs, legislators must establish a distinct, concrete injury in fact." American Civil Liberties Union of Tennessee v. Darnell, 195 S.W.3d 612, 625 (Tenn. 2006). See also Markham v. Wolf, 635 Pa. 288, 298, 136 A.3d 134, 140 (2016) (noting that there is no "special category of standing for legislators" and that "[s]tanding for legislators claiming an institutional injury is no different than traditional standing and, in order for legislators to bring a particular challenge, the legislators must satisfy the prudential standing criteria"); and Hendrick v. Walters, 865 P.2d 1232, 1236 (Okla. 1993) ("When a member of the law-making assembly initiates legal proceedings in a representational capacity as a senator or a member of the House of Representatives, that legislator can claim no elevated status in establishing standing. The lawmaker must meet the same threshold criteria required of any other litigant." (emphasis and footnotes omitted)).
In fact, not only are legislators not cloaked with a "special category of standing," Markham, 635 Pa. at 298, 136 A.3d at 140, but also, "to establish standing, a legislator must overcome a heavy burden" because "[c]ourts are reluctant to hear disputes that may interfere with the separation of powers between the branches of government." Dodak v. State Admin. Bd., 441 Mich. 547, 555, 495 N.W.2d 539, 543 (1993). See also Turner v. Shumlin, 163 A.3d 1173, 1178 (Vt. 2017) (noting that, "[a]lthough legislators, like other plaintiffs, must satisfy [the] elements to demonstrate standing, separation of powers and the limited role of the judiciary compel particular scrutiny in determining whether there is an injury in fact" (internal citations omitted)).
This Court has not expressly addressed what constitutes an "injury in fact," King, supra, to a legislator in his or her capacity as a legislator sufficient to establish standing to sue in that official capacity. In Riley v. Joint Fiscal Committee of Alabama Legislature, 26 So.3d 1150 (Ala. 2009), this Court, without discussing standing, affirmed a summary judgment in favor of legislators who had filed a claim alleging that then Governor Bob Riley had exercised the line-item veto power in an unconstitutional manner.[7] Thus, it appears *288 that this Court has at least implicitly determined that a legislator can, under some circumstances, suffer an injury in his or her capacity as a legislator that will confer upon him or her standing to sue in that official capacity. However, Riley cannot be read as a carte blanche establishment of standing so as to allow legislators to challenge any executive action. Rather, as noted, a legislator seeking to establish standing in his or her official capacity as a legislator must demonstrate that he or she has suffered " 'an actual, concrete and particularized "injury in fact" ' " in that capacity. King, 50 So.3d at 1059. See also Darnell, Markham, and Hendrick, supra. Thus, the dispositive question regarding Morrow's standing as a legislator in this case is whether an allegation that officials in the executive branch have refused or failed to comply with the provisions of previously enacted legislation-and, in doing so, have usurped the legislature's appropriation power-constitutes an injury in fact to an individual legislator sufficient to establish standing in his or her capacity as a legislator to prosecute an action challenging the actions of the executive-branch officials.
Courts that have addressed the issue of legislator standing have held that a legislator suffers an injury in fact in his or her capacity as a legislator only in limited circumstances, which typically include (1) allegations that the legislator has been deprived of his or her right to vote or that his or her legislative votes have been nullified and (2) allegations that the legislator has been deprived of his or her constitutional right to advise and consent on executive appointments or other matters upon which a legislator has a right to act. See, e.g., Turner, 163 A.3d at 1179 (holding, and noting that other courts have held, that a senator had "legislative standing when a governor's conduct concerning the appointment of state officers interfered with the complaining legislators' constitutional duty to provide advice and consent with regard to the appointments"); McDermott v. Ige, 135 Haw. 275, 287, 349 P.3d 382, 394 (2015) (noting that both federal and state caselaw "show that ... a legislator may indeed have standing to challenge a law if his or her vote was nullified or if he or she was unlawfully deprived of the right to vote"); Hanabusa v. Lingle, 119 Haw. 341, 348, 198 P.3d 604, 611 (2008) (holding that legislators' allegation that the governor had usurped their right to advise and consent on executive appointments was " 'sufficiently personal to constitute an injury in fact' " (quoting Dennis v. Luis, 741 F.2d 628, 631 (3d Cir. 1984) )); State ex rel. Ohio Gen. Assembly v. Brunner, 114 Ohio St. 3d 386, 391, 872 N.E.2d 912, 919 (2007) (holding that legislators had standing to prosecute an action seeking "to prevent nullification of their individual votes" by executive officials' refusal to treat a bill as validly enacted law); Silver v. Pataki, 96 N.Y.2d 532, 536, 755 N.E.2d 842, 845, 730 N.Y.S.2d 482, 485 (2001) (holding that a legislator had standing to challenge the constitutionality of the governor's veto power on the basis that a legislator "can maintain an action 'to vindicate the effectiveness of his vote where he is alleging that the Governor has acted improperly so as to usurp or nullify that vote' " (quoting Silver v. Pataki, 274 A.D.2d 57, 67, 711 N.Y.S.2d 402, 410 (2000)
*289 (Williams, J., dissenting))); and Fordice v. Bryan, 651 So.2d 998, 1003 (Miss. 1995) (holding that legislators had standing to challenge the governor's use of the veto power because the legislators' votes "were adversely affected by the Governor's vetoes").[8]
However, when legislators have attempted to challenge executive action on the grounds that it failed to comply with previously enacted legislation or amounted to a usurpation of the legislature's appropriation power, courts have generally determined that the alleged injury is too attenuated and, thus, have been reluctant to conclude that the legislators had suffered "an actual, concrete and particularized 'injury in fact,' " King, 50 So.3d at 1059, in their capacity as legislators sufficient to establish standing to sue in that capacity.
In Markham, supra, legislators sought to intervene in an action filed against the Governor of Pennsylvania challenging the Governor's issuance of an executive order that allegedly conflicted with existing law and, the legislators argued, "was an unauthorized attempt by the Governor to exercise legislative power in violation of the separation of powers doctrine." 635 Pa. at 292-93, 136 A.3d at 137. In holding that the legislators lacked standing to intervene, the Supreme Court of Pennsylvania discussed Wilt v. Beal, 26 Pa. Cmwlth. 298, 363 A.2d 876 (1976), the case of first impression in Pennsylvania regarding legislator standing.
In Wilt, W. William Wilt, a legislator, sought to enjoin executive officials from allegedly unlawfully operating a recently completed mental-health-care facility and sought the reimbursement of any moneys expended in the operation of the facility. The Commonwealth Court of Pennsylvania discussed federal caselaw regarding legislator standing and noted that, in those cases, a legislator had been denied standing "to contest actions which he claimed impaired the effectiveness of legislation for which he had voted and on which his vote was duly counted." 26 Pa. Cmwlth. at 305, 363 A.2d at 881 (emphasis added). In concluding that Wilt lacked standing, the Supreme Court of Pennsylvania stated:
"What emerges from this review of the federal cases is the principle that legislators, as legislators, are granted standing to challenge executive actions when specific powers unique to their functions under the Constitution are diminished or interfered with. Once, however, votes which they are entitled to make have been cast and duly counted, their interest as legislators ceases. Some other nexus must then be found to challenge the allegedly unlawful action.... To give but one familiar example, under the Pennsylvania Constitution, members of the Senate have the duty to approve or disapprove certain appointments made by the Governor. Interference with the performance of this duty would be an injury to members of the Senate sufficient to give each senator standing to protect the injury to his or her 'constitutional right' to vote for or against confirmation of an executive appointee.
"Applying this reasoning to the case at hand, we find no connection between Wilt's status as a legislator and any constitutional provision alleged to have been breached by the defendants' actions. Wilt complains that the purpose of the bill for which he had voted has been frustrated, thus depriving him of the effectiveness of his vote. However, once Wilt's vote had been duly counted and *290 the bill signed into law, his connection with the transaction as a legislator was at an end. Therefore, he retains no personal stake ... in the outcome of his vote which is different from the stake each citizen has in seeing the law observed. He therefore has no standing to sue in his capacity as a legislator."
26 Pa. Cmwlth. at 305-06, 363 A.2d at 881 (emphasis added).
After discussing Wilt and other Pennsylvania caselaw and federal caselaw, the Supreme Court of Pennsylvania concluded in Markham:
"What emanates from our Commonwealth's caselaw, and the analogous federal caselaw, is that legislative standing is appropriate only in limited circumstances. Standing exists only when a legislator's direct and substantial interest in his or her ability to participate in the voting process is negatively impacted, ... or when he or she has suffered a concrete impairment or deprivation of an official power or authority to act as a legislator .... These are injuries personal to the legislator, as a legislator. By contrast, a legislator lacks standing where he or she has an indirect and less substantial interest in conduct outside the legislative forum which is unrelated to the voting or approval process, and akin to a general grievance about the correctness of governmental conduct, resulting in the standing requirement being unsatisfied....
"Upon consideration, we find that Appellants are not aggrieved, as that term is understood in the standing context, because their interests in the underlying challenge to [the executive order] are too indirect and insubstantial. [The executive order] does not inhibit or in any way impact Appellants' ability to propose, vote on, or enact legislation. The order does not touch upon the constitutional or legislative prerequisites for the voting upon and enacting of legislation. Nor does the order prevent Appellants from acting as legislators with respect to advising, consenting, issuing, or approving matters within their scope of authority as legislators. Rather, the legislators' claim of aggrievement is only that the recently enacted [executive order] is a violation of the separation-of-powers doctrine, in that, they claim, it diminishes the effectiveness of, or is inconsistent with, prior-enacted legislation. Yet, these claims of injury reflect no impact on Appellants' right to act as legislators, and are more, in our view, in the nature of a generalized grievance about the correctness of governmental conduct. Simply stated, the assertion that another branch of government-here, the executive branch through the Governor's Executive Order-is diluting the substance of a previously-enacted statutory provision is not an injury which legislators, as legislators, have standing to pursue.
"Indeed, taking the unprecedented step of allowing legislators standing to intervene in, or be a party to, any matter in which it is alleged that government action is inconsistent with existing legislation would entitle legislators to challenge virtually every interpretive executive order or action (or inaction)."
635 Pa. at 305-06, 136 A.3d at 145 (emphasis added).
Thus, the Supreme Court of Pennsylvania's determination that the legislators in Markham lacked standing was based on its conclusion that the issuance of the executive order did not interfere with "unique legislative prerogatives" and "only remotely impact[ed] the legislators' right to act as legislators." 635 Pa. at 291, 136 A.3d at 136 (emphasis added). Significantly, the Supreme Court of Pennsylvania was unpersuaded by the legislators' argument that *291 they had standing because, they said, the executive order had "diminishe[d] the effectiveness of, or [was] inconsistent with, prior-enacted legislation." 635 Pa. at 306, 136 A.3d at 145. That is to say, the legislators argued that they had standing because, they alleged, the executive order affected legislation on which they had already acted. However, the Supreme Court of Pennsylvania concluded that, even if that allegation was true, the executive order did not interfere with the legislators' power to act in the first instance. Thus, the Court concluded, the legislators' alleged injury was simply "too indirect and insubstantial" to establish standing. Id. See also Russell v. DeJongh, 491 F.3d 130, 134-35 (3d Cir. 2007) (noting that "the authorities appear to hold uniformly that an official's mere disobedience or flawed execution of a law for which a legislator voted ... is not an injury in fact for standing purposes" but that "an official's 'distortion of the process by which a bill becomes law' by nullifying a legislator's vote or depriving a legislator of an opportunity to vote ... is an injury in fact"); Alons v. Iowa Dist. Court for Woodbury Cty., 698 N.W.2d 858, 872-73, 874 (Iowa 2005) (rejecting the notion that legislators have standing to "see[ ] that the 'law ... is properly enforced' " on the grounds that, "when the only claim is nonobservance of the law, such claim affects only the generalized interest of all citizens" and "[a]ny injury resulting from such nonobservance is abstract in nature and not sufficient for standing"); and Chiles v. Thornburgh, 865 F.2d 1197, 1205 (11th Cir. 1989) (rejecting a senator's argument that he had "a right to see that the laws, which he voted for, are complied with" on the ground that "[s]uch a claim of injury ... is nothing more than a 'generalized grievance[ ] about the conduct of the government' " that did not constitute "a legally cognizable injury" (quoting Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) )).
Similarly, in Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin, 498 S.W.3d 355 (Ky. 2016), the Supreme Court of Kentucky considered whether legislators had standing to prosecute an action alleging that the governor of Kentucky had violated the separation-of-powers doctrine by "reduc[ing] the amount of money made available to a state university under a legislative appropriation," i.e., that the governor had failed to comply with previously enacted legislation. 498 S.W.3d at 359. In holding that the legislators lacked standing, the Supreme Court of Kentucky stated:
"The idea that individual legislators have standing to challenge an action by the Governor-under the premise of an injury to an interest in a statute being carried out properly or the legislators' duty to vote on legislation-is simply too attenuated to create a justiciable controversy. A legislator has no individual ownership of any enacted piece of legislation and certainly can pass no legislation as an individual....
"....
"Individual legislators simply do not have a sufficient personal stake in a dispute over the execution or constitutionality of a statute, even when the claim is that another branch of government is violating the separation of powers."
498 S.W.3d at 367-68 (emphasis added).
Thus, in Beshear, as in Markham, the allegation that the governor's actions violated previously enacted legislation was insufficient to confer standing upon the legislators because the governor's actions had not infringed upon the legislators' power to act; rather, the alleged injury was, as it was in Markham, that the governor's actions were not in compliance with statutory *292 law on which the legislature had already acted.[9] Likewise, in Mottl v. Miyahira, 95 Haw. 381, 23 P.3d 716 (2001), legislators filed an action alleging that officials in the executive branch had violated the separation-of-powers doctrine by reducing the University of Hawaii's budgetary allocation below the amount appropriated by the legislature. The legislators argued that they had standing because they had " 'not only the interest of a general member of the public in seeing that the laws of the state are complied with, but the interest of persons who have spent their own official time on behalf of their constituents, reviewing, voting on, and enacting budgets that become law.' " 95 Haw. at 392, 23 P.3d at 727. In concluding that the legislators lacked standing, the Supreme Court of Hawaii stated that the legislators' argument
"establishes [the legislators'] 'special interest' but not an 'injury in fact.' [The legislators] have not alleged any 'personal stake in the outcome of the controversy,' inasmuch as they have not alleged that they had personally suffered any 'distinct and palpable injury.' Because a 'special interest' in the subject matter of a lawsuit is insufficient to invoke judicial intervention, [the legislators] are without standing in this action."
Id. (quoting Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court, 91 Haw. 51, 55, 979 P.2d 1077, 1081 (1999) ) (internal citation omitted). Thus, although the legislators claimed that their status as legislators established a "special interest," and thus standing, to see that the executive officials complied with the budgetary allocation already passed by the legislature, the Supreme Court of Hawaii held that the legislators had failed to allege an injury in fact in their capacities as legislators as a result of the executive-branch officials' failure to comply with previously enacted legislation.
What can be gleaned from the caselaw discussed above is that a mere allegation that executive action is unlawful because it fails to comport with previously enacted legislation is simply too attenuated to establish an injury in fact to a single legislator and, thus, is an insufficient ground upon which the single legislator can establish standing to challenge the executive action. This is so because, as the Supreme Court of Pennsylvania noted in Wilt, supra, once a legislator's vote on a bill has been counted and the bill signed into law, the legislator's "connection with the transaction as a legislator," Wilt, 26 Pa. Cmwlth. at 306, 363 A.2d at 881, is at an end, and a subsequent failure to comply with the provisions of validly enacted legislation is nothing more than "a generalized grievance about the correctness of governmental conduct" that does not in any manner impact a single legislator's ability to act in his or her capacity as a legislator. Markham, 635 Pa. at 306, 136 A.3d at 145. Put differently, an allegation "that the purpose of the bill for which [a legislator] had voted has been frustrated" is different from an allegation that actions of executive-branch officials have operated to prevent a legislator from exercising his or her legislative authority in the first instance. Wilt, 26 Pa. Cmwlth. at 306, 363 A.2d at 881.
That is not to say that a legislature as a whole does not have an interest in seeing *293 its validly enacted laws executed in accordance with their provisions and, thus, standing to bring an action seeking to ensure that executive officials comply with statutory law. See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, --- U.S. ----, 135 S.Ct. 2652, 2664, 192 L.Ed.2d 704 (2015) (concluding that the Arizona legislature as a body had standing because it "assert[ed] an institutional injury, and it commenced [the] action after authorizing votes in both of its chambers"); Biggs v. Cooper ex rel. County of Maricopa, 236 Ariz. 415, 418, 341 P.3d 457, 460 (2014) (noting that the Arizona Supreme Court has held that "individual legislators lack standing because they do not suffer an 'injury to a private right or to themselves personally' when they simply complain that their votes were counted, but the effect was nullified by the governor's acts," but that it had held that "the legislature as a body suffers a direct institutional injury, and so has standing to sue, when an invalid gubernatorial veto improperly overrides a validly enacted law" (emphasis added)); and Raines v. Byrd, 521 U.S. 811, 821, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (noting that the legislators' claim was "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally"). See also Anthony Clark Arend & Catherine B. Lotrionte, Congress Goes to Court: The Past, Present, and Future of Legislator Standing, 25 Harv. J.L. & Pub. Pol'y 209, 274 ("[A]n institutional injury can only occur to the institution as a whole. Accordingly, only the entity that is injured, the Senate, the House, or Congress, should be regarded as an injured party for standing purposes.").
Similarly, the plaintiffs' allegation that the defendants' alleged funding of the project with moneys not authorized by the Act was a usurpation of the legislature's appropriation power alleges an institutional injury to the legislature as a whole because only the legislature can appropriate State funds; Morrow, individually, cannot. See Kerr v. Hickenlooper, 824 F.3d 1207, 1215 (10th Cir. 2016) (holding that legislators' allegation that they had been "deprive[d] ... of their ability to perform the 'legislative core function[ ] of ... appropriation' " was an institutional injury and that, therefore, the legislators, absent the legislature's authorization, lacked standing to prosecute the action on the legislature's behalf); Conant v. Robins, Kaplan, Miller & Ciresi, L.L.P., 603 N.W.2d 143, 150 (Minn. Ct. App. 1999) (holding that "it is apparent that the senator is alleging an institutional, not a personal, injury" where the senator alleged that state funds had been expended without a legislative appropriation); and Harrington v. Schlesinger, 528 F.2d 455 (4th Cir. 1975) (holding that four federal legislators whose complaint alleged that executive-branch officials' unauthorized expenditures violated the United States Constitution's Appropriation Clause lacked standing to prosecute the action). A single legislator, acting individually, does not have standing to prosecute an injury to the entire legislature.
It has been suggested that a small bloc of legislators might have standing to prosecute, on behalf of the legislature, an action alleging an institutional injury when it has been authorized by the legislature to do so. See Beshear, 498 S.W.3d at 368 ("The individual legislators have not shown that they are representative of the entire body of the General Assembly. They 'have not been authorized to represent their respective Houses ... in this action.' " (quoting Raines, 521 U.S. at 829 )); Kerr, 824 F.3d at 1215 ("In determining whether a party may rely on an institutional injury to demonstrate standing, *294 the Court has considered whether the plaintiffs represent their legislative body as an institution."); Bennett v. Napolitano, 206 Ariz. 520, 527, 81 P.3d 311, 318 (2003) ("Nor can these four petitioners assert standing to litigate claims of injury to the legislature as a whole.... Petitioners here, consisting of four of ninety members of the legislature, have not been authorized by their respective chambers to maintain this action. When a claim allegedly belongs to the legislature as a whole, four members who bring the action without the benefit of legislative authorization should not, except perhaps in the most exceptional circumstances, be accorded standing to obtain relief on behalf of the legislature."); Raines, 521 U.S. at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit."); and Dodak, 441 Mich. at 553, 495 N.W.2d at 542 (noting that the legislators' action "had not been authorized by either House"). See also Arend & Lotrionte, 25 Harv. J.L. & Pub. Pol'y at 275 ("Because decisions by Congress are made by vote as a collective whole, one or several members should not be able to 'step into the shoes of the' Congress and invoke its claim to injury. ... Absent the consent of the body, an individual member would thus be powerless to sue.").
Absent such authorization, however, it does not appear that other jurisdictions have found that either a single legislator or a small bloc of legislators has standing to prosecute an action alleging an institutional injury to the legislature. Indeed, to hold otherwise could result in a scenario where a single legislator, perceiving a "separation-of-powers injury" to the legislature as a whole, purports to bring an action seeking to redress the alleged injury, yet the majority of the legislature he or she purports to represent perceives no injury at all. See Raines, 521 U.S. at 829 (noting that the action had been brought by only six members of Congress but that "both Houses actively oppose" the action).
In this case, the plaintiffs alleged that the defendants' actions with respect to the funding of the project violated the Act and operated to usurp the legislature's appropriation power. To the extent those actions constituted injuries at all, they are injuries to the legislature as a whole, but not to Morrow as an individual legislator, and, although the plaintiffs have arguably alleged institutional injuries to the legislature, they have not indicated that Morrow has been authorized to prosecute the action on behalf of the legislature. In fact, for all that appears, Morrow is the only member of the legislature who perceives an injury to the legislature as a result of the defendants' allegedly unlawful actions. Accordingly, because the plaintiffs' complaint alleged, at most, institutional injuries to the legislature as a whole, and because there is no indication that Morrow has been authorized to prosecute the plaintiffs' action on behalf of the legislature, the trial court did not err in determining that Morrow lacked standing to prosecute the plaintiffs' action in his capacity as a legislator.
Conclusion
Because the issue of the plaintiffs' standing in their individual capacities has not been preserved for appellate review and because the plaintiffs do not have standing to prosecute their action in their official capacities, the trial court did not err in dismissing the complaint. Accordingly, the judgment is affirmed.
AFFIRMED.
Stuart, C.J., and Bolin, Shaw, Bryan, and Sellers, JJ., concur.
Parker and Wise, JJ., concur in the result.
Main, J., recuses himself.

It appears that the defendants no longer hold the offices they held when they were sued in their official capacities. Pursuant to Rule 43(b), Ala. R. App. P., the State officials holding the offices vacated by the defendants are automatically substituted on appeal, in their official capacities, for the defendants, to the extent the defendants were sued in their official capacities.

The defendants in the district court case were Federal and State officials who had been designated to conduct a "Natural Resource Damage Assessment."

Strange did not join the other defendants' motion to dismiss but, instead, filed his own motion to dismiss in which he also asserted lack of standing as a ground for dismissal. Because both motions asserted lack of standing as a ground for dismissal, we have, for simplicity, treated the separate motions as a single motion to dismiss.

Grimsley was represented by the same attorneys who represented the plaintiffs in this case.

The complaint did allege that § 36-16-2, Ala. Code 1975, "confer[s] powers upon [Zeigler] that include ... authority to require information on oath, to be administered by him, from any person touching any claim or account he is required to audit" and that Zeigler "has attempted, in furtherance of his duties, to obtain information ... from ... Bentley but ... Bentley has refused to comply with his demands." Thus, the complaint continued, Zeigler had "no alternative" but to file this action "in order to obtain information Alabama law requires him to obtain from any person touching any claim or account he is required to audit."
However, the plaintiffs make no argument on appeal regarding any attempts by Zeigler to obtain information from the governor's office. Moreover, we fail to see how a judgment declaring that the defendants have violated the Act and enjoining further expenditures that contravene the Act would afford Zeigler any relief with respect to the plaintiffs' allegation that the governor's office has failed to comply with his requests for information. See Henri-Duval Winery, 890 So.2d at 74 (noting that, to establish standing, a party must demonstrate "a likelihood that the injury will be 'redressed by a favorable decision' " (quoting Lujan, 504 U.S. at 560-61 )).

Alternatively, the complaint, as to Zeigler, simply failed to present the " 'bona fide justiciable controversy' " required for a declaratory-judgment action because, although it alleged that the defendants' actions were unlawful, it failed to identify, as to Zeigler, any "present 'legal rights [that are being] thwarted or affected [so as] to warrant proceedings under the Declaratory Judgment statutes.' " Creola Land Dev., Inc. v. Bentbrooke Hous., L.L.C., 828 So.2d 285, 288 (Ala. 2002) (quoting Gulf South Conference v. Boyd, 369 So.2d 553, 557 (Ala. 1979), and Town of Warrior v. Blaylock, 275 Ala. 113, 114, 152 So.2d 661, 662 (1963) ).

Riley had previously petitioned this Court for a writ of mandamus directing the dismissal of the action. See Ex parte Riley, 11 So.3d 801 (Ala. 2008). Although Riley had argued in his motion to dismiss that the legislators lacked standing, the Court stated that the "sole issue ... is whether ... the underlying case is ripe for review." Id. at 806. Determining that the case was ripe, the Court denied Riley's petition without discussing the issue of standing.
Chief Justice Cobb, however, authored a special concurrence in which she concluded "that the legislators here suffered a legally significant injury that gave rise to a definite and concrete controversy sufficient to ensure both that they had standing to sue and that the issue they presented was ripe for review ...." Id. at 810 (Cobb, C.J., concurring specially).

Given that Riley concerned the constitutionality of then Governor Riley's use of the line-item veto to veto parts of the legislature's 2009 general-fund-appropriations bill, it appears that Riley is in accord with the above-cited caselaw.

Because the Supreme Court of Kentucky determined that the attorney general of Kentucky, who was also a plaintiff, did have standing to prosecute the action, it addressed the merits of the appeal and held that the governor had exceeded his statutory authority. Thus, even when it is conclusively determined that an executive-branch official's actions are not in compliance with previously enacted legislation, individual legislators do not have standing to challenge the action.